Argued March 31, reversed and remanded April 26, rehearing denied June 21, 1921.

## CRAM *v.* POWELL.

(197 Pac. 280.)

**Payment—Recoverable Where Made Under Duress, but not Where Voluntary.**

1. A payment made under compulsion, coercion, or duress may be recovered, but where made by the debtor on his own motion without compulsion, it is voluntary and cannot be recovered.

Payment—Involuntary Payment not Recoverable from Person Who Did not Exercise or Know of Duress.

2. An involuntary payment cannot be recovered from a person who did not exercise the duress or have knowledge thereof at time of receiving the money.

Payment—"Duress" Defined.

3. "Duress" constitutes such pressure or constraint as compels a man to go against his will and virtually takes away his free agency and destroys the power of refusing to comply with the unlawful demand of another, irrespective of the manifestation or apprehension of physical force.

Payment — Made Under Apprehension That Other Creditor Might Institute Foreclosure Proceedings not Involuntary.

4. That payment to one creditor was made under the apprehension that another creditor might institute foreclosure proceedings did not render the payment to the first creditor involuntary in the sense that it could be recovered back.

Trial—Motion for Nonsuit Admits Truth of Plaintiff's Testimony.

5. A motion for nonsuit admits the truth of plaintiff's testimony.

Trial—Case Submitted to Jury if There is Any Competent Evidence to Support Cause of Action.

6. If there is any competent testimony tending to support plaintiff's cause of action, he is entitled to have it go to the jury, but, if there is no such evidence, it is the court's duty to grant the nonsuit.

From Crook: T. E. J. DUFFY, Judge.

Department 1.

This is an action at law for money had and received. The parties are H. S. Cram, plaintiff and respondent, and H. F. Powell, defendant and appellant. The cause was tried in the Circuit Court of the State of Oregon in and for Crook County, and resulted in a verdict for the plaintiff in the sum of $1,236.46.

The plaintiff alleges two causes of action. In the first, he sets forth that there was due and owing defendant from plaintiff on the twenty-first day of October, 1913, the sum of $14,377.40; that this indebt-

2. On the question of right to recover back money paid under duress of real property, see notes in 94 Am. St. Rep. 419; 2 L. R. A. (N. S.) 574; L. R. A. 1915B, 498.

edness was evidenced by three separate promissory notes; that on October 21, 1913, plaintiff and defendant met in the City of Portland, Oregon, and attempted to arrive at a settlement of the total amount due on the said notes, but were unable to decide as to the exact amount due thereon; that plaintiff agreed to, and did, deliver to defendant a promissory note executed by plaintiff and wife for the sum of $14,580, and that plaintiff and wife executed a mortgage on a portion of their real property in Crook County, Oregon, to secure the payment of said note. Plaintiff alleges that it was agreed at that time between defendant and himself that they would later get together and compute the true amount due the defendant, and that they would make any necessary correction in favor of the plaintiff or of the defendant. He further alleges that the said promissory note was in an amount that equaled $202.60 more than was owing to the defendant from plaintiff on the date of the alleged settlement; that plaintiff did not discover that he had given a note and mortgage for such excessive amount until January, 1919, when the First National Bank of Prineville, to which he was indebted in the sum of $10,000; T. M. Baldwin, of Prineville, to whom he was indebted in the sum of $8,000, and Manford Nye, to whom he was indebted in the sum of $670.43 (all of which sums were long past due), demanded immediate settlement of their respective claims; that each of the above-named creditors refused substantial payments on their claims in any sum less than the entire amount due, and threatened at once to reduce same to judgment, levy execution and sell all the property of the plaintiff, both real and personal, to his great and irreparable financial loss; that the plaintiff then, for the first time, began to calculate his total indebt-

edness, and discovered that he had given defendant his note and mortgage on the twenty-first day of October, 1913, for $202.60 in excess of the amount justly due defendant from plaintiff; that he immediately demanded of the defendant that he rectify the error, which the defendant refused to do. Plaintiff alleges that in order to pay said creditors, he was compelled to procure a loan in the amount of $31,000, a sum sufficient to satisfy all of said creditors and the defendant herein as well; that to procure said loan it was necessary to have the lands securing defendant's mortgage free of all encumbrance, so that plaintiff would be enabled to give a first mortgage in accordance with the demands of one C. Sam Smith, who was making the loan to him.

For a second cause of action plaintiff alleges, among other things, that on the eighth day of November, 1914, he paid defendant, on account of said note and mortgage, $600, to be applied thereon, and that on the twenty-first day of February, 1915, he paid defendant the additional sum of $100 for like purpose. He further alleges that the defendant failed and neglected at the time of payment, or at any time thereafter, to give plaintiff credit for said sums, all of which remained unknown to plaintiff until the —— day of January, 1919; that the defendant refused to give plaintiff credit for said sums and demanded payment of said $700 in addition to the amount justly due him, before he would discharge and release his said mortgage, whereupon plaintiff paid to defendant, under protest, said sum of $700, in addition to the sum justly due him.

Defendant, answering, admits and alleges that on or about September 20, 1913, plaintiff and defendant arrived at a settlement of the various matters pend-

ing between them, at which time it was agreed that plaintiff was indebted to defendant in the sum of $14,580, and denies that the note was drawn for the sum of $202.60 in excess of the amount due.

Answering the second cause of action defendant alleges that at the time of settlement between plaintiff and defendant, during the month of January, 1919, defendant allowed and permitted each and every and all of the credits and payments to which plaintiff was entitled as against his note dated October 21, 1913, and denies that any demands were made against the plaintiff, or that any payments were exacted, except those to which defendant was justly entitled. Defendant admits that during the month of January, 1919, plaintiff demanded that he be given credit for certain alleged sums other than those indorsed on the note.

H. S. Cram testified, among other things, that Mr. Baldwin had served notice upon him in the spring of 1918, that the notes due the bank and himself must be paid, and that he threatened foreclosure.

"Q. And the time limit that had been given you by Mr. Baldwin in the summer had long since passed?

"A. No, not so very long since passed; twenty-four days. Now, I will explain that to you if you will give me a chance. After Mr. Baldwin became acquainted with the fact that Mr. Russell was going to get his money from Portland to take up the Sam Smith note, and that Sam Smith was going to let me have the money, Mr. Baldwin told me some time between Christmas and New Year's, 'Now, Henry, you are doing your best. I see what you are trying to do, and if you go on and complete these negotiations, it is all right. Otherwise, I must foreclose. The bank examiners insist and say these notes will not be carried any longer. * * ' I made every effort possible to raise the money on part of the place without interfering with Powell's loan and I could not do it. I

made application to different persons, including several loan companies. The only person I could get that would have anything to do with it at all was C. Sam Smith, and he said he would take it providing he could have all the lands included in the property. * *

"Q. How much time did you have in which to bring a suit against Powell to cancel that mortgage?

"A. I had all the time there was, but I had to meet those notes right away.

"Q. Was Powell kicking about his? Was Powell threatening foreclosure?

"A. I don't know what he was doing. He was in Portland; I was out here. * *

"Q. When you paid off the principal of your mortgage to Powell, state whether or not you paid it under protest.

"A. Yes, sir; I did, and I called Carey Foster and Wurzweiler both to witness the protest. I paid the money and protested the payment on the ground that there was $700 there that * * . I will say I did not pay it freely * * . I paid the money and protested the payment on the ground that there was $700 there that had not been credited on the note, and that I had discovered an error of some $200 which we had made in the original computation of the figures that formed the basis of the note."

Lynn Cram testified as follows:

"Q. State what occurred when you went into the bank with that check.

"A. I took the check into the First National Bank and Mr. Baldwin was presiding; it was at noon, I believe, and he was at the window, and I gave this check to him with the instructions to credit it to us on our account with him, his personal account, and he shoved the check back to me and said that he could not do that until after the bank's account had been taken up, and he also stated very emphatically to tell my father that he would expect him to take up both notes, that is, both debts, within the time limit he had set."

H. F. Powell testified, on the part of defendant:

"Q. Did you ever write Henry Cram a letter and tell him you had to have your money on this note?

"A. Yes, sir.

"Q. Did you ever tell him you would foreclose it if he didn't pay it?

"A. No, sir.

"Mr. Wirtz (Plaintiff's Attorney): We object to that line of questioning. There is no allegation in the complaint, and there is no testimony on the part of the plaintiff to that effect."

The following letter was offered and received in evidence:

"Imperial Hotel,
"Portland, Ore., Jan. 27, 1919.
"First National Bank of Prineville,
"Prineville, Ore.

"Gentlemen:

"I hereby enclose you satisfaction of mortgage of Mr. H. S. Cram.

"As there is a misunderstanding between Mr. Cram and myself as to a payment of $746.00, I wish you would look up for me if Mr. Cram's a/c showed in your books that he paid between the 22d and 25th of July, 1914, such amount. You can deliver the release on payment of the notes—but if not, I want you to hold the release and not accept the payment.

"Yours respectfully,
"H. F. POWELL.

"50 Ella St., Portland, Ore."

As a witness for defendant, Manford Nye testified that he held a certain mortgage and note against plaintiff for some two years; that he had not threatened to bring immediate suit on the mortgage or note and that there was no intention on his part to institute such proceedings, but that he had extended the time of payment of the same.

Harold Baldwin testified, upon the part of defendant, that he was cashier of the bank; that plaintiff owed the bank $10,000 evidenced by three notes due at

different dates; that as cashier of the bank he had charge of the collections; that he did not, during the year of 1918 or 1919, refuse substantial payment on the amount which Mr. Cram owed the bank, and that he did not, verbally or by letter, threaten to reduce those notes to judgment in case they were not paid. The following letter was offered and received in evidence:

"First National Bank.
"Prineville, Oregon, March 1, 1917.
"Mr. Henry S. Cram,
     "Prineville, Or.
"Dear Sir:
"I have a letter from my father in California and he is expecting you to make a payment on your note right away. His account at the bank is about depleted and as his living expenses are high and taxes amounting to about $1500 are due or will be shortly, he must have some money. If you can do nothing he is coming home at once and start proceedings because he will not let the matter stand longer.

"I also want to call your attention again to the interest that was due December 9th on your note to the bank. The Examiner was here a few days ago and he informed us that it must be collected.

"Thanking you in advance for your attention to these matters, we remain,
               "Yours very truly,
                    "H. BALDWIN,
                         "Cashier."

The record shows that T. M. Baldwin, father of H. Baldwin, referred to in the foregoing letter and in paragraph 8 of the amended complaint, had died previous to payment by plaintiff to defendant of the mortgage note for $14,580, and that witness Baldwin was acting as administrator of the estate of T. M. Baldwin, his father.

At the conclusion of the plaintiff's testimony, defendant filed a motion for judgment of nonsuit as to the first and second causes of action, specifying as grounds therefor, among other things, that:

"There is no competent, or any, evidence before the jury tending to show that the plaintiff was under undue influence or coercion or compulsion or imposition or duress at the time of the payment to the defendant, and that the evidence discloses that said payment, if made, was made voluntarily."

—which motion was overruled.

From the judgment rendered upon the verdict returned by the jury in favor of plaintiff, defendant appeals to this court, assigning some forty alleged errors.                   REVERSED AND REMANDED.

For appellant there was a brief and an oral argument by *Mr. N. G. Wallace.*

For respondent there was a brief over the names of *Mr. Jay H. Upton* and *Mr. Willard H. Wirtz,* with an oral argument by *Mr. Upton.*

BROWN, J.—At the threshold the writer will repeat a common observation of the courts when discussing cases of this character: Each case founded upon the ground of duress must rest upon its own peculiar facts and circumstances.

1. It is a well-established principle that a payment made under compulsion, coercion or duress may be recovered. It is equally well settled that a payment made by the debtor on his own motion, without compulsion, is voluntary, and an action will not lie for its recovery.

The evidence set down in the statement, together with the following, is substantially the testimony of plaintiff as a witness, in support of the allegations

in his complaint that the payment made by plaintiff to defendant was involuntary.

In the summer of 1918, Mr. Baldwin (T. M.) notified witness that the bank's mortgage must be paid by the first of January, 1919. After receiving this notice, he made an attempt to recover on everything he could turn into money and tried to obtain loans from a number of persons. When he sold his wheat he received a check for $4,300 and sent it to the bank by his son to be applied on his indebtedness to Mr. Baldwin personally, who refused to accept it because he said the bank's money had to come first. Witness testified that he made every endeavor to raise the money on part of his place without interfering with the Powell loan, but without success; that, when he paid off the principal of his mortgage to Powell, he did so under protest. He further testified that "the forcing of this proposition all came from Mr. Baldwin"; that subsequent to Mr. Baldwin's death, plaintiff met H. Baldwin, son of Mr. Baldwin, and, after expressing regret at the passing of his father, stated:

"The one regret that I had in his father's passing at that time was that I had not been able to pay him before he died, because he had been very considerate with me and had really gone further than good business rules would admit."

That after the death of Mr. Baldwin, no one representing either the estate or the bank made any threat to foreclose or bring suit; that Manford Nye had never refused a substantial payment upon his claim, nor had the First National Bank; that the only creditor who had ever refused to take a substantial payment was Mr. Baldwin, and his refusal was to accept it upon his personal account in lieu of applying it upon the claim due the bank.

This court, in the case of *Siverson* v. *Clanton,* 88 Or. 261, 267 (170 Pac. 933, 935), approved the following definition of "duress":

"To constitute duress, it is sufficient if the will be constrained by the unlawful presentation of a choice between comparative evils; as inconvenience and loss by the detention of property, loss of property altogether, or compliance with an unconscionable demand. It has been held, however, that duress of property cannot exist without there being a threat to do some act which the threatening party has no legal right to do,—some illegal exaction, or some fraud or deception. The restraint must be imminent and such as to destroy free agency without present means of protection." 9 R. C. L. 723, par. 12.

In the recent case of *Southern Oregon Co.* v. *Gage, ante,* p. 424 (197 Pac. 276), Mr. Justice BURNETT said:

"What constitutes sufficient duress to authorize recovery of money paid under its influence is a difficult question. The issue is affected by the disposition and capacities of the parties. Many instances are cited where a mere threat to sue somebody who was of weak mind and easily influenced constituted such duress. The principle is thus stated in *Lehigh Coal & Nav. Co.* v. *Brown,* 100 Pa. 338: 'It may be said in general that there must be some actual or threatened exercise of power * * possessed by the party exacting or receiving the payment, from which the latter has no other means of immediate relief.'"

2. Before an involuntary payment may be recovered, it must be established that the payment was exacted under duress by the person against whom the action was brought. Does the evidence in this case establish that the payment made by plaintiff to defendant was by duress proceeding from the defendant against the plaintiff? 21 R. C. L. 145, § 169; *United States* v. *New York etc. Mail S. S. Co.,* 200

U. S. 488 (50 L. Ed. 569, 26 Sup. Ct. Rep. 327, see, also, Rose's U. S. Notes); note, 45 Am. Dec. 154. The authorities in this note are to the effect that the duress must proceed directly or indirectly from the party receiving payment. However, if Powell knew that he had no right to the money and that it was paid under duress, he could be compelled to refund, although the duress did not proceed from him.

We carve the following excerpt from an opinion sustaining a defense to an action upon a note obtained by means of duress by plaintiff from one Ogilvie, executed in consideration of the debt of another:

"In examining the authorities upon the question as to what pressure or constraint amounts to duress justifying the avoiding of contracts made, or the recovery back of money paid, under its influence, one is forcibly impressed with the extreme narrowness of the old common-law rule on the one hand and with the great liberality of the equity rule on the other. At common law, 'duress' meant only duress of the person, and nothing short of such duress amounting to a reasonable apprehension of imminent danger to life, limb or liberty was sufficient to avoid a contract or to enable a party to recover back money paid. But courts of equity would unhesitatingly set aside contracts whenever there was imposition or oppression, or whenever the extreme necessity of the party was such as to overcome his free agency. The courts of law, however, gradually extended the doctrine so as to recognize duress of property as a sort of moral duress, which might, equally with duress of the person, constitute a defense to a contract induced thereby or entitle a party to recover back money paid under its influence. And the modern authorities generally hold that such pressure or constraint as compels a man to go against his will, and virtually takes away his free agency, and destroys the power of refusing to comply with the unlawful demand of another, will

constitute duress, irrespective of the manifestation or apprehension of physical force." *Joannin* v. *Ogilvie,* 49 Minn. 564 (52 N. W. 217, 32 Am. St. Rep. 581, 16 L. R. A. 376).

3, 4. The writer agrees with the doctrine stated in that case. However, we are bound by the facts peculiar to the case at bar. From the evidence of record, we hold that the apprehension of the plaintiff that Baldwin or the bank might institute foreclosure proceedings, does not render the payment to Powell involuntary in the sense that it can be recovered back: *Mayor etc. of Baltimore* v. *Leffermann,* 4 Gill, 425 (45 Am. Dec. 145, and extensive note); *Weber* v. *Kirkendall,* 44 Neb. 766 (63 N. W. 35); *Town of Ligonier* v. *Ackerman,* 46 Ind. 552 (15 Am. Rep. 323, and note). (This case has since been overruled on another point.) It has been held that, if a party pays rather than litigate, he is without a remedy: *Lester* v. *Mayor etc. of Baltimore,* 29 Md. 415 (96 Am. Dec. 542); *Benson* v. *Monroe,* 7 Cush. 125 (54 Am. Dec. 716). It has been written that:

"When the person making the payment can only be reached by a proceeding at law, he is bound to make his defense in the first instance and he cannot postpone the litigation by paying the demand in silence and afterwards suing to recover the amount paid." 21 R. C. L. 143, par. 166.

"It is the well-established general rule that it is not duress to institute or threaten to institute civil suits, or take proceedings in court, or for any person to declare that he intends to use the courts wherein to insist upon what he believes to be his legal rights." 9 R. C. L. 722, par. 11.

There is a class of cases where, although there is a legal remedy, a person's situation, or the situation of his property, is such that the legal remedy would not be adequate to protect him from irreparable pre-

judice: 21 R. C. L. 150, par. 175. The cases of *Joannin* v. *Ogilvie,* 49 Minn. 564 (52 N. W. 217, 32 Am. St. Rep. 581, 16 L. R. A. 376), and *Kilpatrick* v. *Germania L. Ins. Co.,* 183 N. Y. 163 (75 N. E. 1124, 111 Am. St. Rep. 722, 2 L. R. A. (N. S.) 574, and cases in the note), are illustrative of the principle. But the case at bar does not come within the principle. The defendant's motion for a nonsuit should have been sustained: Section 182, subd. 3, Or. L.

5, 6. We realize that a motion for nonsuit admits the truth of plaintiff's testimony, and if there is any competent evidence tending to support the cause, he is entitled to have it go to the jury. But, when there is no evidence that tends to sustain plaintiff's cause of action, it is the duty of the court to grant the nonsuit and withdraw the case from the jury.

In fact, the plaintiff's own testimony proves that his payment to Powell was not made under duress. He testified, in referring to the payment of his indebtedness, that "the forcing of this proposition all came from Mr. Baldwin," and that "he [Baldwin] had been very considerate with me and had really gone further than good business rules admit." It has never been decided that the demands of a considerate creditor upon a debtor to pay his just obligations constitute coercion, compulsion or duress.

After the denial of defendant's motion for nonsuit, he offered testimony in his own behalf. It has been held by this court that a motion for nonsuit is not waived by the defendant's introducing evidence after the motion has been denied, unless it cures the defect in plaintiff's evidence: *Carney* v. *Duniway,* 35 Or. 133 (57 Pac. 192, 58 Pac. 105); *Northern Pac. Ry. Co.* v. *Spencer,* 56 Or. 250 (108 Pac. 180); *Dryden* v. *Pelton Armstrong Co.,* 53 Or. 421 (101 Pac. 190);

100 Or.—46

*Patty* v. *Salem Flouring Mills Co.,* 53 Or. 363 (96 Pac. 1106, 98 Pac. 521, 100 Pac. 298).

This case is reversed and remanded for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.   REHEARING DENIED.

BURNETT, C. J., and McBRIDE and HARRIS, JJ., concur.

