## Lehigh Coal and Navigation Company *versus* Brown, et al.

1. Under its acts of incorporation, the Lehigh Coal and Navigation Company is required to keep open a certain descending navigation on the river Lehigh, as specified therein, and this condition is not changed by the supplements to said acts, to wit, the Acts of March 13th 1837, March 4th 1863, and April 20th 1864.

2. The dams forming said descending navigation between Stoddartsville and the mouth of Wright's Creek were destroyed by a freshet in 1862, and were not rebuilt by the company, who continued, however, to charge tolls for logs floated over this portion of the river. In an action to recover back the tolls,—*Held*, that the company had no right to collect them, after the destruction of the dams.

3. To ∙ constitute the compulsion or coercion which the law will recognize as sufficient to render a payment involuntary, there must be some actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment, from which the party making the payment has no other means of immediate relief.

4. Plaintiffs in an action to recover back tolls paid, showed that they denied the company's right to collect the tolls; but that their mill was situated on a pool formed by the company's dam at White Haven, from which the water could be drawn by the company, and the plaintiffs thus prevented from getting their logs to their mill; and that an agent of the company, acting within the scope of his authority, threatened to draw the water from the dam if the tolls were not paid. *Held*, that the payment of the tolls by the plaintiffs was involuntary, and that they could be recovered, with interest from the dates of payment.

April 14th 1882. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

ERROR to the Court of Common Pleas of *Luzerne county :* Of January Term 1882, No. 248.

This was an action of assumpsit by William D. Brown and Cyrus Lawall, trading as Brown and Lawall, against the Lehigh Coal and Navigation Company, to recover a certain sum of money paid by plaintiffs to the said company as tolls on logs floated down the Lehigh River from points near Stoddartsville to the plaintiffs' mill at White Haven.

On the trial, before RICE, P. J., the following facts appeared ; By the act of March 20th 1818 (P. L. 202), certain franchises were granted to persons named therein, for the improvement of the Lehigh river, and by the act of February 13th 1822 (P. L. 21), the Lehigh Coal and Navigation Company succeeded the original grantees. The improvements were: First, " a descending navigation," constructed by removing obstructions from the river bed,

and making a channel through which rafts, lumber, &c., could be floated by means of artificial freshets, created by opening the gates of dams, made for the purpose along the river. The acts required the company, inter alia, to make a good downward navigation, with a channel not less than 20 feet wide and 18 inches deep, at least once in three days, except in winter, and authorized them to collect certain tolls for "every thousand feet board measure of boards, timber, planks, &c.," floated down said descending navigation. The second improvement under said acts was a "slack water navigation," consisting of a series of dams connected by locks and canals, by which navigation was made for boats in both directions.

The act of March 13th 1837 (P. L. 52), authorized the company to construct a railroad to connect the Pennsylvania Canal at Wilkes-Barre with the said slack water navigation; and provided substantially that they should be deemed to have performed all their duties, when they had completed a descending navigation from the falls at Stoddartsville to the mouth of Wright's Creek and a slack water navigation from there to Mauch Chunk. In June 1862, nearly all the dams of the descending navigations were destroyed by a freshet, and many of those connected with the slack water navigation. After the freshet the company did not reconstruct the dams above the mouth of Wright's Creek, which is near White Haven—but nevertheless charged the plaintiffs tolls on logs floated down the river from Stoddartsville to White Haven, claiming the right to do so under the above acts and the supplements thereto which are as follows:—the Act of March 4th 1863 (P. L. 99), providing that the Lehigh Coal and Navigation Company be "relieved from any and every obligation, at law or in equity, to place or keep in repair their slack water navigation above Mauch Chunk, or any portion thereof, except such part of the same as the board of managers of said company shall in one year from the date hereof, determine to repair, and signify such, their determination, by writing filed in the office of the Secretary of the Commonwealth," . . . . and the Act of April 20th 1864 (P. L. 533), providing "That the election of the Lehigh Coal and Navigation Company, under the act to which this is a supplement, to repair certain parts only of their slackwater navigation above Mauch Chunk, shall not be construed as a surrender or abandonment by the said company of any right, property, or franchises, heretofore granted to the said company on the river Lehigh, or of any title, interest, or estate, heretofore vested in them, upon or along the site heretofore occupied by any portion of their said navigation, or works connected therewith, except the right to reconstruct those portions of their said works not included in their said election, and except also

the right to charge tolls for lumber, or other things, passing upon the river where the said navigation is not maintained by the said company." Under these acts the company filed its election to repair certain parts of the slack water navigation, among others the dams at White Haven, and made the repairs. The election did not include any part of the improvements above the mouth of Wright's Creek. The plaintiffs paid the tolls, but brought this action to recover them back; First, because the company had not kept open a descending navigation as required by the above acts, and Second, because the payments were involuntary and made under constraint. In support of the second proposition plaintiffs introduced evidence to show that their mill was located on a pool formed by the company's dam at White Haven; that the company had the power to draw the water from this dam, which would have rendered it impossible for plaintiffs to get their logs out of the pool; and that an agent of the company, acting within his authority, had threatened to draw the water from the dam if the tolls were not paid. The Court charged the jury, inter alia, as follows:

"It appears further from the testimony that lumber and logs were floated in rafts for only two or three years after the erection of the company's works; after which, rather against the judgment of the company, as testified to by Mr. Brown, but for the benefit and advantage of the lumber-men, they were allowed to float their logs loosely or singly, or to drive them. Under this clause in their charter and the supplement thereto and the evidence in the case, we are of opinion that from 1837 to 1862 the defendant company was authorized to charge the tolls designated by the statute on logs or lumber floated down the descending navigation, whether in rafts or single logs." . . . . . "We think under a fair construction of the statute in view of the testimony they were authorized to charge tolls on single logs. . . ." The Act of 1863 refers by its terms to the slack water navigation; but it appears that in the following year, 1864, in compliance with the terms of the act, the defendant company filed its election to repair certain parts of this slack water navigation, and the dam at White Haven, as we understand, was one of the works which they elected to repair. This election did not include any part of its improvements above the mouth of Wright's Creek. In the following year another act was, passed, which it is said was for the purpose of removing any doubt as to the fact of the company's election." After quoting the text of the act. "Now, it is claimed by the defendant company that this section confirms their right to demand tolls, notwithstanding the destruction of the descending navigation. This we do not think is in accord with either the spirit or letter of the act. The act applies not only to the slack water navigation, but by

its terms it applies to the whole river Lehigh, and the rights which the defendant company had in the whole river, and the right ' to charge tolls for lumber and other things passing upon the river where such navigation is not maintained by said company' is especially excepted out of the saving provisions of the act. We think it was not contemplated under the charter that when the descending navigation should be destroyed the company should be still entitled to charge tolls without rendering some value. Neither was it intended by the Act of 1864 to confer upon the company or confirm such alleged right after they had concluded what portion of the navigation on the river they would rebuild and maintain. In this connection we read the defendants' fifth point, which is as follows :

5. " That the fact that the descending navigation is out of repair is not an issue in this case, and does not affect the question of the right of the company to charge toll on the descending navigation."

If the evidence were of a simple failure to repair, the point might be well taken prior to the company's election, and prior to the alleged destruction of the navigation in 1862, and prior to the Act of 1864 ; but under the evidence in the case, we think it is not well taken here. We think the testimony as to the condition of the stream and the defendants' artificial navigation, and their failure to rebuild, or elect to rebuild it, is pertinent here, and the sole remedy would not be by proceeding by indictment under the statute. The point is therefore answered in the negative. ( First assignment of error.)

In the same connection we read the plaintiffs sixth point as follows :

" That the right of the Lehigh Coal and Navigation Co. to charge tolls on the Lehigh river from Stoddartsville to Wright's Creek depended on the performance of the conditions contained in their charter viz. : That they should make a good navigation downwards at least once in every three days, except during the winter, not less than twenty feet wide and eighteen inches deep for arks and rafts, and of sufficient depth of water to float down boats of the burden of one hundred barrels or ten tons ; and if the jury find that at the time the tolls claimed for were collected, no such navigation existed then the company had no lawful authority to charge or collect tolls."

This is in accordance with our general charge and we affirm the point. (Second assignment of error.) We also in the same connection read the defendants' first point which is as follows :

" That under the evidence the plaintiffs' have failed to prove, that the defendants' collected tolls without authority of law, and that therefore the plaintiffs' are not entitled to recover." We decline to charge as requested in that point. If you find that

[Lehigh Coal and Navigation Co. *v.* Brown.]

the artificial navigation was destroyed in 1862; that the defendants did not re-construct it, nor elect to re-construct it, then they were not authorized to collect tolls on logs floated down to the mouth of Wright's Creek. They, however, still would be entitled to collect tolls for that portion of the river from Wright's Creek to the plaintiffs' mill, which has been described as being about one half a mile or something like that. (Third assignment of error.) . . . . . It does not appear here in evidence that at the time any specific payment was made there was any specific protest on the part of the plaintiffs, or any specific refusal on the part of defendant company to deliver the logs or permit them to be taken from the pool. The defendants' counsel regard this as a decisive question, and request us to charge in their second, third and fourth points as follows:

" Second. That the payments were voluntary, and the evidence failing to show any act of defendants retaining plaintiffs' logs, or interfering with the same in the possession of the boom company, plaintiffs are not entitled to recover."

" Third. That there is no evidence of any payment having been made under protest, or under duress."

" Fourth. That under the evidence in the case plaintiffs are not entitled to recover."

We decline to charge as requested in these points. We do not feel warranted in saying that under no circumstances can the plaintiffs recover because there was not a specific refusal to deliver the logs at the time of any payment, or the failure of the plaintiffs to protest specifically at the time of payment. Nor can we say that under no view of the evidence or finding of the facts, can the plaintiffs recover. (Fourth assignment of error.)

This brings us to the plaintiffs' second and fifth points, which substantially raise the question as we propose to submit it to you.

Plaintiffs' second point is: " That if the jury believe that plaintiffs denied defendants' right to collect the tolls, and that defendants threatened to stop their logs in case of non-payment, by drawing the water from the dam at White Haven, they having the ability to carry the threat into execution, and that the tolls were paid under such a state of facts, then the payments were not voluntary, and may be recovered back."

This point we affirm. (Fifth assignment of error.)

Plaintiffs' fifth point is: " That payments induced by fraud, misrepresentation, or deceit, or made under a threatened exercise of power possessed, or supposed to be possessed, by the said defendants, through their agents or servants, over the property of the plaintiffs, it may be recovered back."

As to this point we must say that there is no evidence of fraud, misrepresentation, or deceit. If you should find, however,

that the payments were made under a threatened exercise of power possessed, or supposed by the plaintiffs to be possessed by the said defendants, by their agent or their servant, acting within the general scope of his authority, over the property of the plaintiffs, it can be recovered back. Subject to these corrections we affirm the point. The threat of an agent not acting within the general scope of his authority, would not make a payment made to him under those circumstances involuntary. Therefore the correction we have made we deem material. (Sixth assignment of error.)

. . . . . [Mr. Chertz testifies as to certain conversations which he overheard at some of the meetings which he attended. These were to the effect that if the tolls were not paid the company could put the lumbermen to considerable trouble ; could draw off the dams for thirty days at a time. You will remember this testimony and apply to it the instructions that we have given you with regard to their conversations.] (Eighth assignment of error.) . . . . [Now, if under these instructions you shall find that the exaction of tolls was unlawful, and that the payments were involuntary—made by the plaintiffs under constraint and coercion—your verdict should be . . . . for $562.55, . . . . subject to the deduction for services from the mouth of Wright's Creek to the plaintiffs' mill, with interest."] (Seventh assignment of error.)

Verdict for plaintiffs and judgment thereon for $803.33. Whereupon the company took this writ, assigning for error the answers of the court to the points as above, and those portions of the charge enclosed in brackets.

*Andrew T. McCormick* and *Charles Gibbons*, for plaintiffs in error.—The rights of the company to charge tolls over the descending navigation, by virtue of the Acts of 1818 and 1822, are not taken away by any of the supplements thereto. The Act of 1863 refers only to the slack water navigation, and the Act of 1864 declares that the election of the company under the Act of 1863 shall not be construed as a surrender by them of any right, franchise or estate on the River Lehigh except, inter alia, the " right to charge tolls where the said navigation (slack water) is not maintained ; and the second section expressly confirms all other rights, &c., granted to the company. Under its acts of incorporation the company are liable in damages for failure to keep the descending navigation in repair, and are therefore protected by their charter from this action to recover tolls paid to them.

The Act of 1818 provides for the collection of tolls on " timber," which includes logs : Worcester's Dictionary. The bills for tolls were rendered monthly, and no protest against their

payment is proved. Where there is no mistake or fraud, a voluntary payment cannot be recovered back on the ground that one party was under no obligation to pay and the other had no right to receive it. There must be a protest against payment: McCrickart *v.* City of Pittsburg, 88 Pa. St. 133; Borough of Allentown *v.* Sager, 20 Pa. St. 421; Taylor *v.* Board of Health, 31 Pa. St. 73; 2 Sm. L. C. *392; Thomas *v.* P. & R. R. R. Co., 1 W. N. C. 621; Hunt *v.* Todd, 18 Pa. St. 316. The verdict should not include interest from date of payment of the bills: Jacobs *v.* Adams, 1 Dall. 52; Brown *v.* Campbell, 1 S. & R. 176; King *v.* Diehl, 9 S. & R. 409.

*G. L. Halsey* (with him *Henry W. Palmer*), for defendants in error.—The Acts of 1818 and 1822, which granted the original franchises to the company, required them to keep open a certain kind of descending navigation, and their right to collect tolls upon it depended on the performance of the condition of the grant, which was not changed by the subsequent acts. After the freshet in 1862 the company did not rebuild the dams of the descending navigation between Stoddartsville and the mouth of Wright's Creek, and the jury found as a fact the abandonment of this improvement.

The company never had the right to charge tolls on single logs. The acts of incorporation provided for the payment of tolls on "boards, timber, planks or scantling," and on "shingles or other materials in rafts;" and the Act of 1837 simply provided for the payment of tolls on "lumber in rafts." The Legislature have nowhere provided for a charge for tolls upon single floating logs.

The logs of the defendants in error were in the company's dam at White Haven, and in order to get them to the mill they must be first floated on the dam for half a mile and hauled up on a slip running into the dam when full. The company had the power to let the water out of this dam, and threatened to do so if the tolls were not paid. The payment of the tolls was therefore under such duress and constraint as to be recoverable in this action: White *v.* Heylman, 10 Casey 145; Chase *v.* Dwinal, 7 Greenleaf 134; Hospital *v.* Phila. County, 12 Harris 231; Astley *v.* Reynolds, 2 Strange 915. The computation of interest was correct: Brown *v.* Campbell, 1 S. & R. 176; Minord *v.* Beans, 14 Sm. 411; Koons *v.* Miller, 3 W. & S. 271.

Mr. Justice STERRETT delivered the opinion of the court, October 5th 1882.

It is conceded the plaintiffs below were not entitled to recover back the amount of tolls paid by them to the Lehigh

Coal and Navigation Company without proving to the satisfaction of the jury, 1st. That the Navigation Company wrongfully and without authority demanded and collected the tolls in question; and, 2d. That the payment of the tolls by the plaintiffs was involuntary. If they failed to establish either of these propositions the verdict should have been in favor of the defendant below.

The question involved in the former proposition is presented by the first three specifications of error. In disposing of it the court below was called upon to construe the charter of the Navigation Company, including the several acts supplementary thereto. This has been so fully and satisfactorily done by the learned judge in his general charge and answers to points submitted by counsel, that it is unnecessary to add anything to what is there said. Having thus correctly construed the several Acts of Assembly bearing on the subject, he then instructed the jury that the Navigation Company was not authorized to collect tolls on logs floated down the Lehigh River to the mouth of Wright's Creek if they found from the evidence that the artificial navigation was destroyed in 1862, and the company had neither reconstructed nor elected to reconstruct the same. As to these matters of fact there was practically no conflict of testimony, and the verdict being in favor of the plaintiffs below, the question of the Navigation Company's right to collect the tolls in controversy was thereby determined in the negative. We fail to discover any error in the rulings of the court on that subject, and hence the first, second and third assignments are not sustained.

The question involved in the second proposition, as to whether the tolls in controversy were voluntarily or involuntarily paid, is raised by the fourth, fifth and sixth specifications. The complaint in the fourth assignment is, that the court refused to affirm defendant's second, third and fourth points, and thereby withdraw the question of involuntary payment from the jury. Under the testimony in the case that became a question of fact for the jury, and it appears to have been submitted to them with proper instructions. In affirming the second point of plaintiffs below, which is the subject of complaint in the fifth assignment, the learned judge charged the jury that if the plaintiffs denied the right of the company to collect the tolls; that the company threatened to stop their logs, in case of non-payment, by drawing the water from the dams at White Haven; that it had the ability to carry the threat into execution, and that the tolls were paid under such a state of facts, then the payments were not voluntary and may be recovered. He also charged in answering the point covered by the sixth assignment, that if the payments were made under

a threatened exercise of power (possessed or supposed by the plaintiffs to be possessed by the company) by its agent or servant acting within the general scope of his authority over the property of the plaintiffs, the money thus paid can be recovered; but the threat of an agent, not acting within the general scope of his authority, would not make a payment to him under those circumstances involuntary. In further elucidation of these instructions, the learned judge in his general charge summarized the facts, which the plaintiffs below were required to prove before they could recover, as follows, to wit: That their mill was located on the company's pool; that the company had the power to draw off the water in the pool; that such action would render it practically impossible to get out their logs, and thus prevent them from using the stream for the purpose of floating or driving logs from their lands above; that the plaintiffs denied the right of the company to collect the tolls in question; that the company or its agent, acting within the general scope of his authority, before the tolls were paid and before the logs were delivered, declared to plaintiffs that if the tolls were not paid the water would be drawn off from the dams, and plaintiffs would have been thus prevented from getting out their logs if the threat had been executed, and that this threat was repeated from time to time, and was the cause which induced the plaintiffs to make the payments. Assuming, as we must necessarily do, that the jury obeyed their instructions, the facts above specified are conclusively established by their verdict. Can there be any doubt, then, that upon the facts so found the plaintiffs below were entitled to recover? We think not. They bring the case fairly within the rule stated by Mr. Justice FIELD in Brumagim *v.* Tillinghast, 18 California 272, in which, after discussing the English and American cases on the subject of involuntary payments, he says: " What shall constitute the compulsion or coercion which the law will recognize as sufficient to render the payments involuntary, may often be a question of difficulty. It may be said in general that there must be some actual or threatened exercise of power, possessed or supposed to be possessed by the party exacting or receiving the payment, from which the latter has no other means of immediate relief." According to the finding of the jury in the case before us, there was a threatened exercise of power possessed by the company which, if it had been carried into execution, would have practically ruined the business of the plaintiffs below. The jury has found that the threat, repeated from time to time, had the effect of coercing payment of the tolls. The plaintiffs below had no other means of immediate relief. They were compelled either to submit to the unlawful demand of the company or run the risk of having their busi-

ness practically destroyed or seriously interrupted. The same general principle is recognized in some of our own cases : Hospital *v.* Philadelphia Co., 12 Harris 229; White *v.* Heylman, 10 Casey 142; Motz *v.* Mitchell, 10 Norris 114; and cases there cited. In the former case it is said " where a party has been compelled by duress of his person or goods to pay money for which he is not liable, it is not voluntary, and he may rescue himself from such duress by payment of the money, and afterwards, on proof of the fact, recover it back ;" and in support of this doctrine Astley *v.* Reynolds, 2 Strange 915, is there cited. In that case the plaintiff had pawned a lot of plate as security for a loan of twenty pounds. In due time he offered to redeem the pledge, and in addition to the principal tendered more than sufficient to cover the interest to which defendant was entitled; but the latter demanded ten pounds interest. After repeating the tender without success he finally yielded to the exorbitant demand of defendant, paid the ten pounds, and then brought suit to recover the excess over the legal interest. It was contended that the payment being made, with full knowledge of all the facts, was voluntary; and that plaintiff having made a sufficient tender might have maintained an action of trover and conversion, &c., but the court in entering judgment in his favor said : " The plaintiff might have such immediate want of his goods that an action of trover would not do his business. Where the rule, *volunti non fit injuria,* is applied, it must be where the party had his freedom of exercising his will, which this man had not. We must take it that he paid the money, relying on his legal remedy to get it back again."

The remaining assignments are not sustained. The testimony was quite sufficient to justify the court in submitting the question of involuntary payment to the jury. There is no error in the ruling of the court in regard to interest.

Judgment affirmed.