364 A.2d 470

NATIONAL AUTO BROKERS
CORPORATION

v.

ALEEDA DEVELOPMENT CORPORA-
TION, Appellant.

Superior Court of Pennsylvania.

Sept. 27, 1976.

102

Henry Thalenfeld, Wilkes-Barre, for appellant.

Joseph G. Feldman, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

This is an appeal from a final decree which: (1) declared an agreement for the sale of land null and void because entered into "as a result of business compulsion and economic duress imposed upon" plaintiff-appellee National Auto Brokers Corporation (hereinafter Nabcor) by defendant-appellant Aleeda Development Corporation (hereinafter Aleeda); and, (2) ordered specific performance of a prior writing which proposed that Nabcor be granted an option to purchase the land in question and which provided that an agreement for sale of the land would be consummated by the parties if the option was exercised. We reverse the order entered below for the reasons which follow a review of the relvant facts.

The first of the two writings involved in this case was initially drafted in the form of a Nabcor proposal to purchase approximately 520 acres of land located in Bear Creek Township, Luzerne County from Aleeda. Dated July 4, 1972, the proposal provided that, in consideration of $2,500, Aleeda would grant a 30 day option to Nabcor to purchase the land involved at $1,000 per acre. The precise acreage was to be determined by a survey that was to be prepared by Nabcor. Since Nabcor was short of funds, the proposal provided that an agreement of sale would be consummated under which Nabcor would furnish a down payment on the purchase consisting of a $150,630 debenture payable in one year and collateralized

by 50,000 shares of Nabcor stock.[1] The July 4th proposal read, *inter alia,* as follows:

"Nabcor desires an option for 30 days and is prepared to turn over a consideration in cash of $2,500.00 as a binder of the option. If the option is exercised the transaction will be consummated through an agreement to purchase at the said price of $1,000.00 per acre, payable 29% of the total purchase price in the form of a one year debenture in the approximate amount of $150,630.00 collateralized by 50,000 shares of Nabcor stock as a guarantee."

The proposal further provided that upon payment of the debenture, the debenture and the 50,000 shares of Nabcor stock would be returned and Aleeda would receive 10,000 shares of Nabcor stock as additional payment. The remainder of the total purchase price of approximately $520,000 was to be subsequently paid in equal quarterly installments over a period of five years at 6% interest. It was also proposed that Aleeda would release lots from the tract to third parties upon payment by Nabcor of $750 per lot, which was to be applied to the overall purchase price. The proposal was signed by Nabcor following a June 19, 1972 meeting; it was signed by Aleeda on July 4, 1972.

Prior to the end of July, 1972, Aleeda's president determined that Nabcor's stock was worth approximately $.25 per share, far below the value necessary to guarantee the proposed debenture[2] as provided for in the op-

1. Aleeda claims that Nabcor's stock was represented to it as then having an over-the-counter market value of $3.50 per share. Nabcor claims that it represented the value as being "[a] couple of dollars" per share. Printed record at 46a; 99a.

2. Nabcor claims that Aleeda could have determined this fact prior to the end of July, 1972. Aleeda, however, claims that its president, who was employed by the U.S. Department of Labor, was unable to previously check the status of the Nabcor stock because he was involved from June 23, 1972 until two weeks after July 4, 1972 in serving during the emergency following Tropical storm Agnes. The lower court found as a fact that Aleeda's

tion agreement's provision relating to the agreement of sale to be consummated. Consequently, on or about August 1, 1972, Aleeda informed Nabcor that the proposed collateral was unacceptable and that the July 4th agreement would not be implemented unless additional security was furnished. Nabcor insisted that Aleeda was bound by the July 4th writing, however, as adopted.

On August 3, 1972, after discussion between the parties, a second agreement was worked out in the form of a formalized agreement of sale. Under the August 3rd agreement the consideration of $1,000 per acre remained the same, as did the arrangements for determining the precise acreage to be sold. However, the payment terms were substantially different from those contained in the option agreement. Pursuant to the August 3rd agreement of sale, Aleeda was to receive monthly payments of $30,000 for one year (except for three winter months during which $20,000 per month was to be paid by Nabcor) on account of the purchase price.[3] At the end of the year Aleeda was to deed the entire tract to Nabcor and to take back a purchase money mortgage.[4] Aleeda's right to receive 10,000 shares of Nabcor stock as additional consideration was deleted from the new agreement and the release price of individual lots, to be applied to the monthly payments, was increased from $750 per lot to $1,000 per lot.

Nabcor thereafter proceeded to continue its development plans. Aleeda conveyed two lots to Nabcor for a demonstration home and sales office. Eighteen additional lots were conveyed to seventeen buyers during August, September and early October, 1972. On September 15,

president had experience with the stock market and that he had over a month to check the value of Nabcor's stock.

3. Under the July 4th agreement Nabcor would have had to pay slightly in excess of $10,000 per month during the first year.

4. The July 4th agreement provided that a deed for the entire tract would not be delivered until the total purchase price was paid.

1972, Nabcor paid the initial $30,000, less $2,000 credit for the sales and demonstration lots release price. However, it defaulted on the October payment.[5] Nabcor then attempted to renegotiate the August 3rd agreement. In a letter to Aleeda's president, counsel for Nabcor sought a three month moratorium on payments under the August 3rd agreement and a reduction in the amount of future monthly payments. Aleeda rejected this proposal and claimed that Nabcor was in default.

On October 20, 1972, Nabcor filed a complaint in equity seeking specific performance of the *July 4th* agreement. Aleeda countered by interposing the agreement of August 3rd and Nabcor answered by asserting that the August 3rd agreement was null and void because obtained under duress. A trial was then held and, after the taking of testimony, the trial judge rendered an adjudication and decree nisi ordering and decreeing that the agreement of August 3, 1972 was null and void, that the agreement of July 4, 1972 was valid and enforceable, and that the defendant Aleeda must, within 120 days, perform its obligations under the contract of July 4, 1972. Aleeda filed timely exceptions, which were dismissed below, and this appeal followed.

Nabcor's argument below was that it was forced to enter the agreement of August 3rd because of economic duress and business compulsion. It claimed that at the beginning of August 1972 it had expended over $100,000 in reliance on the July 4th agreement and that it was forced to sign the August 3rd agreement or go out of business. Aleeda, on the other hand, argued that the situation Nabcor found itself in was created by Nabcor and not Aleeda, that because Nabcor was incapable of providing collateral guaranteeing the debenture under the July 4th

5. As of mid-October, 1972, Aleeda had received in excess of $40,000 from Nabcor on account of payments for release of lots and the September payment. Nabcor's sales of lots conveyed to third parties by Aleeda under the August 3rd agreement amounted to more than $123,000.

agreement it therefore could not have complied therewith, that the August 3rd agreement was valid and based on mutual consideration, and that, even if the August 3rd agreement was entered under duress, it was only voidable and Nabcor's subsequent actions ratified it.

The lower court, citing *Lehigh Coal & Navigation Co. v. Brown,* 100 Pa. 338 (1882), *Tri-State Roofing Co. v. Simon,* 187 Pa.Super. 17, 142 A.2d 333 (1958), and *Smelo v. Girard Trust Co.,* 158 Pa.Super. 473, 45 A.2d 264 (1946), first noted that appellee's claim of economic duress or business compulsion has been recognized by our Courts as a basis for avoidance of an agreement entered as a result thereof. The lower court then concluded that the circumstances surrounding the negotiation of the August 3rd agreement, including the fact that appellee had expended $100,000 in reliance on the July 4th agreement and that appellee was forced to sign or go out of business, brought that agreement within the ambit of the economic duress or business compulsion doctrine. The lower court also held that there could be no ratification of a contract entered as a result of such economic coercion.[6]

We hold that the lower court erred in reaching both of the above determinations. First, the facts of this case do not support the lower court's conclusion that the doctrine of economic duress or business compulsion operated to void the August 3rd agreement. Second, assuming, *arguendo,* that the August 3rd agreement was induced by economic duress or business compulsion, appellee would still not be entitled to an avoidance of that agreement because economic duress renders a contract *voidable, see Litten v. Jonathan Logan, Inc.,* 220 Pa.Super. 274, 286 A.2d 913 (1971); Restatement, Contracts,

---

6. This latter holding, as articulated by the court en banc, is directly contrary to Restatement, Contracts, §§ 493, 495 and 499 (1932), which suggest that duress makes a transaction induced thereby voidable but not void on facts such as these.

§§ 495, 499 (1932), not void and Nabcor's conduct subsequent to August 3, 1972 clearly ratified the agreement of that date.

■ The court below correctly recognized that the doctrine of economic duress or business compulsion was accorded early recognition in Pennsylvania in *Lehigh Coal & Navigation Co. v. Brown,* supra, an action to recover an amount paid under duress. The doctrine was later applied in *Smelo v. Girard Trust Co.,* supra, and in other cases in which payments were forced under threat of financial ruin. In *Tri-State Roofing Co. v. Simon,* supra, this Court observed that "broadly speaking, 'business compulsion' is a species of duress, not the common-law duress, to be sure, but duress clothed in modern dress. It seems to be established as a general rule, at least in this country, that the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract." *Id.* 187 Pa.Super. at 20, 142 A.2d at 335 *quoting* 17A Am.Jur. 564, § 7 (1957). It is thus well settled that a contract made under economic duress may be avoided under proper circumstances; the question presented by this appeal is whether the instant facts justified such relief.

In *Tri-State Roofing* we made the following general observations concerning the *nature* of the business compulsion doctrine:

"'Business compulsion' is not established merely by proof that consent was secured by the pressure of financial circumstances. But it is said that a threat of serious financial loss is sufficient to constitute duress and ground for relief where an ordinary suit at law or equity might not be an adequate remedy.

"To constitute duress or business compulsion there must be more than a mere threat which might possibly result in injury at some future time, such as a threat of injury to credit in the indefinite future. It must be such a threat that, in conjunction with other circumstances and business necessity, the party so coerced fears a loss of business unless he does so enter into the contract as demanded."

*Id.* Additionally, we noted in *Litten v. Jonathan Logan, Inc.,* supra 220 Pa.Super. at 283, 286 A.2d at 917, that "[a] threatened breach of contract ordinarily is not in itself coercive but if failure to receive the promised performance will result in irreparable injury to business, the threat may involve duress. . . ." We also stated in *Litten* that: "[t]he important elements in the applicability of the doctrine of economic duress or business compulsion are that (1) there exists such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which results in economic loss, and (2) the injured party does not have an *immediate* legal remedy . . .." *Id.* at 282, 286 A.2d at 917.

Application of the above stated principles to particular facts is, at best, a difficult task. Because the applicable principles are broadly stated, we have found a review of the facts of the cases in which these principles are stated to be an essential tool in applying the preceding standards to the present facts.

In *Tri-State Roofing Co. v. Simon,* supra, defendant general contractor and plaintiff subcontractor entered a contract providing that plaintiff would do roofing work on a building being erected by defendant. Following completion of the job, plaintiff filed an action to recover money due for finishing the work. Defendant answered that plaintiff had delayed performance on the project, costing him additional sums. Plaintiff countered this allegation by denying liability for delay and by asserting

in new matter that defendant had released plaintiff from liability therefor. The general contractor then claimed that he had signed the release under duress. The lower court sustained plaintiff's preliminary objections to this defense and appeal was taken to this Court. We affirmed, holding that the plaintiff's action was not duress such as to void the release. In so holding, we noted that a remedy at law for damages was available to the defendant and that the record did not show that defendant could not have secured another subcontractor to complete the unperformed work. We thus held that the general contractor had not been placed in a position by the subcontractor such as to deprive the former of the exercise of free will.

The appeal in *Litten v. Jonathan Logan, Inc.*, supra, was taken from a verdict for plaintiffs in an action in assumpsit. Plaintiffs had been owners of two companies engaged in the women's apparel distribution business and had entered an oral agreement in 1960 and a written agreement in 1961 for the sale of their businesses. The issue of the case was which of the two contracts was determinative of the rights of the parties. Plaintiffs sought damages based on the oral contract of sale, which included an option by Litten to purchase 5,000 shares of defendants' stock at a specified price. Defendant maintained that the written agreement entered in 1961 contained no such provision and that the later document controlled. Plaintiffs responded that they were compelled by duress to enter the later contract because the defendant "had maneuvered plaintiffs into an untenable economic crisis from which they could extricate themselves only by signing the agreement prepared by defendant." A jury verdict was returned for plaintiffs and defendant appealed in part on the ground that there was not sufficient evidence of economic duress. This Court affirmed, finding that there was sufficient evidence.[7]

7. The evidence presented showed that defendant offered to purchase plaintiffs' corporations, to employ plaintiffs for three years,

We also specifically noted that a determinative factor in the case was that the state of financial distress which compelled the plaintiffs' execution of the 1961 agreement was *created by the defendant*. We held that "[i]n the instant case, the final and potentially fatal blow was prepared by defendant, which by its actions created the situation which left plaintiffs no alternative but to sign the contract as written." *Litten v. Jonathan Logan, Inc.*, supra at 282, 286 A.2d at 917.

 Applying the preceding to the case at bar, we find a lack of facts supporting a finding of economic duress or business compulsion. It is clear that, in August 1972, Nabcor was in financial difficulty. However, it is not clear that Nabcor was without alternatives or that Nabcor did not have an adequate remedy at law. First, Nabcor could have sued for breach of contract and sought damages as measured by its expenditures in anticipation of the agreement of sale. Second, it could have brought its suit for specific performance at the point in time at which Aleeda demanded the additional collateral. Alternatively, it could have sued for specific

and to give a stock option to Litten, in the initial oral agreement made in 1960. Plaintiffs and defendant agree that in exchange for all of plaintiffs' stock in the two corporations defendant would pay off all debts (including some which were personally guaranteed by the plaintiffs), would pay to plaintiffs monies remaining in excess of such payments from assets of the corporations, would employ plaintiffs for one year at stipulated salaries, and would give the option to Litten. Plaintiffs claimed that, in reliance upon the mutual oral promises, they made no further effort to resolve their financial situation, which was then solvent. In further reliance upon the oral agreement and at defendant's insistence, plaintiffs transferred and assigned to defendant the entire stock of both corporations. Defendant thus became sole owner of the corporations and plaintiffs were left depending upon defendant to carry out his promises. Defendant made an initial payment to creditors, but made no more. The creditors threatened plaintiffs with bankruptcy. Defendant then delivered the 1961 written agreement to plaintiffs. Having no other alternatives, they signed the second agreement, which provided for no return of excess monies, for no employment period for plaintiffs, and for no stock option. From the date of signing plaintiffs insisted on adherence to the earlier agreement.

performance of the July 4th agreement immediately subsequent to entry into the August 3rd agreement, and made its performance under the latter specifically subject to a determination of the latter contract's validity. Third, it could have sought to guarantee the debenture by obtaining the collateral demanded by Aleeda.[8]

Moreover, it is clear that Nabcor's financial condition was not created by Aleeda's actions. Nabcor's expenditure of over $100,000 in anticipation of an agreement of sale, in view of its shortage of funds, was the source of its distress, not Aleeda's action in requiring that the collateral be sufficient to provide a guarantee. If Nabcor was financially troubled by a request for guarantee as provided for in the July 4th contract it was only because of its own actions in handling its affairs, not as a result, as in *Litten*, of the defendant's actions. We therefore cannot conclude from the facts of this case that Nabcor's position or Aleeda's actions were such that Nabcor was precluded from exercising free will and judgment in entering into the transaction. *See* Restatement of Contracts, § 493 (1932).

Furthermore, even if the agreement of August 3rd was deemed to have been economically coerced and thus potentially avoidable, we are of the opinion that Nabcor's actions subsequent thereto ratified it. A party who possesses a power of avoidance for business coercion loses it by electing to affirm the transaction. *See* Restatement of Contracts, §§ 493, 495, 499 and 484 (1932). *See also McCubbin v. Buss*, 180 Neb. 624, 144 N.W.2d

8. At the time of Aleeda's demand for collateralization guaranteeing the debenture, Nabcor had a $150,000 loan pending to cover the initial payments under the debenture. Moreover, payments later made on the August 3rd agreement were made by General Electric Credit Corporation and a Nabcor affiliate, North American Land. Nabcor did not show that it was unable to obtain collateral; rather, it *chose* to take the position that the 50,000 shares, whether they guaranteed the debenture or not, were all that was required.

175 (1966); *Smith v. Jones,* 76 Misc.2d 656, 351 N.Y.S. 2d 802 (1973). Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract. *Smith v. Jones,* supra. Following entry into the agreement of August 3rd Nabcor proceeded under that agreement, selling 18 lots and obtaining two lots for itself while making a profit. Furthermore, after default on the August 3rd agreement Nabcor, by letter to Aleeda, sought not to disaffirm or rescind the contract but rather to obtain a modification of it. Moreover, the payments made for release of lots and on the purchase price were made pursuant to the August 3rd, and not the July 4th agreement. *See Litten v. Jonathan Logan, Inc.,* supra 220 Pa.Super. at 285, 286 A.2d at 918. Finally, it was only after Nabcor had proceeded under the contract and had failed to negotiate a modification thereof that it brought this suit to "return" to the July 4th agreement.

Our conclusion that the agreement of August 3rd was not voidable because economically coerced and that it was ratified by Nabcor is not determinative of the question of which agreement controls the party's rights and duties, however, absent resolution of an additional issue advanced by appellee. Nabcor also argues that the agreement of August 3rd was without consideration. We disagree. First, the agreement of August 3rd clearly binds Aleeda to sell, whereas the July 4th agreement granted an option and provided for a subsequent formal agreement. *See* Restatement (Second) of Contracts, § 26, comment *d* (Tent. Draft Nos. 1–7, 1973). Second, under the contract of August 3rd Aleeda no longer had a right to receive 10,000 shares of Nabcor stock as additional consideration. Further, it bound itself to conveyance of the tract subject to a purchase money mortgage

following conclusion of the initial payments; under the July 4th agreement conveyance of the tract was not to take place until the complete purchase price was paid. We hold that the August 3rd agreement was supported by mutual consideration.

Order reversed.