SONFAST CORPORATION, Plaintiff,

v.

YORK INTERNATIONAL
CORPORATION,
Defendant.

Civ. A. No. CV–93–0904.

United States District Court,
M.D. Pennsylvania.

Jan. 24, 1995.

Steven M. Hovis, Timothy Paul Ruth, Stock and Leader, York, PA, for plaintiff Sonfast Corp.

John McN. Cramer, Reed, Smith, Shaw & McClay Harrisburg, PA, for defendant York Intern. Corp.

## MEMORANDUM

RAMBO, Chief Judge.

On October 3–4, 1994, this court conducted a nonjury trial in the captioned action. Three counts of the complaint were disposed of at the summary judgment phase, and three counts remained for trial. At the conclusion of the bench trial, the parties requested permission to submit post-trial briefs to summarize the evidence and argue the issues. The court acquiesced to their request. The court is in receipt of the parties' post-trial briefs, including proposed findings of fact and conclusions of law. Thus, the matter is now ripe for disposition.

### I. *Findings of Fact*

1. Plaintiff Sonfast Corporation ("Sonfast"), is a Maryland Corporation with its principal place of business located at 6675 Santa Barbara Road, Elkridge, Maryland.

2. Sonfast supplies commercial and industrial fasteners utilized in the manufacturing of various equipment and machinery.

3. Defendant York International Corporation ("York"), is a Delaware corporation with its principal place of business located at 631 Richland Avenue, York, Pennsylvania.

4. York is a manufacturer of cooling and air conditioning equipment ranging from products designed for household use to customized units for commercial and manufacturing facilities.

5. In the course of its manufacturing, York uses a variety of Fasteners (nuts, bolts, screws and similar articles) to assemble the sheet metal and other materials used in its products.

6. Sonfast and York executed a Fastener Purchasing Agreement dated December 15, 1986 ("Fastener Purchasing Agreement").

7. The Fastener Purchasing Agreement was prepared by Sonfast.

8. The Fastener Purchasing Agreement was executed by York on behalf of its Central Environmental Systems ("CES") Division.

9. The CES Division of York was composed of plants at Norman, Oklahoma; Madisonville, Kentucky; and, Elyria, Ohio.

10. Pursuant to ¶ 2 of the Fastener Purchasing Agreement, the original term of the Agreement was from January 1, 1987 to December 31, 1991.

11. By written Addendum dated October 14, 1988, the parties extended the term of the Fastener Purchasing Agreement to December 31, 1992.

12. By letter dated October 18, 1989, certain other fasteners were added to the Fastener Purchasing Agreement.

13. By written Addendum dated January 1, 1990, the parties extended the term of the Fastener Purchasing Agreement to December 31, 1993.

14. The Fastener Purchasing Agreement and subsequent addenda covered only a portion of the fasteners used by the CES Division.

15. Paragraph 14 of the Fastener Purchasing Agreement states that "[t]his agreement is subject to cancellation in whole or in part should Sonfast's performance significantly fall below minimum acceptable levels with regard to pricing, delivery, quality or service."

16. Terry Bowman and Richard Hoover are York employees who were involved with purchasing for the CES Division during the duration of York's relationship with Sonfast.

17. In 1991, Terry L. Bowman was promoted to a new position as Director of Purchasing for the CES Division of York.

18. In his new position, Terry Bowman was responsible for handling the procurement of commodities, including fasteners, for the CES Division of York.

19. Steve Yount was the Sonfast employee responsible for servicing the York account.

20. In late 1991, Terry Bowman decided to rebid the contract to supply fasteners to the CES Division.

21. Conducting the rebid was part of Terry Bowman's overall strategy to consolidate sources for fastener purchases, obtain a just-in-time delivery system, and change salt spray requirements.[1]

22. Prior to conducting the rebid, Terry Bowman solicited bids from a number of suppliers to test the market for fasteners.

23. Based upon these bids, Terry Bowman concluded that York might be paying Sonfast too much for the fasteners it was purchasing.

24. In or about November of 1991, Terry Bowman informed Steve Yount that York intended to rebid the CES fastener requirements.

25. When informed of York's intentions to rebid, Steve Yount objected and pointed to the Fastener Purchasing Agreement which entitled Sonfast to supply the CES Division requirements through December 31, 1993.

26. York never informed Sonfast that its performance pursuant to ¶ 14 of the Fastener Purchasing Agreement fell below the required minimum acceptable levels with regard to pricing, delivery, quality or service.

27. Paragraph 8 of the Agreement places the burden on Plaintiff to remain competitive with current market prices in its pricing of fasteners.

28. York informed Steve Yount that Sonfast had two options with respect to the rebid: if Sonfast chose not to participate, York would honor the Agreement; or, if Sonfast participated in the rebid, it would relinquish its rights under the Agreement with the chance of obtaining a new contract guaranteeing more business.

29. Implicit in York's ultimatum was the notion that if Sonfast chose to give up its rights under the Agreement and participate in the rebid, Sonfast risked loosing all business with the CES Division if it lost the bid.

30. Steve Yount estimated that at the time of the rebid, Sonfast was providing about 80% to 85% of York's fastener part numbers and about 70% of the dollar volume of the fasteners purchased by the CES Division.

31. Steve Yount told Terry Bowman and Rich Hoover that Sonfast would participate in the rebid.

---

1. Salt spray requirements refer to the length of time which a metal product can withstand rust while being continuously sprayed with a salt water solution. Special coatings are placed on the metal to increase the ability to withstand rust.

32. By letter dated February 7, 1992, York provided Sonfast with a copy of the "1992 Fastener Bid —— CES —— Bid Rules," "York International Corporation Incumbent Bidding Rules," and "York International Corporation, Central Environmental Systems, Standard Parts Specifications."

33. On or about March 12, 1992, Sonfast submitted two (2) bid packages to York.

34. The lower of the two bids, in the amount of $1,110,874.27, was submitted in reliance on the engineering specifications supplied by York with the bid instructions.

35. The higher of the two bids, in the amount of $1,423,411.67, reflected Sonfast's personal knowledge of York's current supply needs, and of parts which York was utilizing at that time.

36. As the result of the bid, on or about March 12, 1992, York selected Tebco to be the fastener supplier for the CES Division.

37. Although Sonfast's bid was nominally lower than Tebco's bid, Tebco was chosen as the winner because it presented a superior proposal for the implementation of an in-house stocking program.

38. York was under no obligation to award the contract solely on the basis of who submitted the lowest bid.

39. The price quotations of both Tebco and Sonfast were about 25% below the price levels at which Sonfast had been furnishing fasteners to York.

40. Shortly after 5:00 p.m. on March 12, 1992, Terry Bowman and Rich Hoover informed Steve Yount that Sonfast had lost the bid to Tebco by a close margin.

41. After March 12, 1992, York made purchases to relieve Sonfast of its inventory of parts that had already been ordered or purchased by Sonfast to service the York account.

42. York was not obligated to continue purchasing parts from Sonfast after the Agreement was terminated on March 12, 1992.

43. York purchased the parts at the prices Sonfast had sold them at in the past even though York could have insisted on the reduced prices Sonfast quoted in its bid.

44. In or about October, 1992, York ceased purchasing parts from Sonfast.

45. On June 24, 1993, Sonfast filed the captioned action.

## II. *Discussion*

As the court noted in a prior memorandum of law, *see Sonfast Corporation v. York International Corporation*, No. 93–0904, 1994 WL 684566 (M.D.Pa. September 21, 1994) (memorandum of law accompanying order granting partial summary judgment in favor of Defendant), little precedent exists to assist the court in interpreting the language of the Pennsylvania Commercial Code. Accordingly, the court will accompany its conclusions of law with the foregoing discussion of the rationale behind the court's conclusions.

After disposing of several issues prior to trial, the following issues remained unresolved at the time of trial: 1) whether the Fastener Purchasing Agreement was modified or breached 2) if the Agreement was modified, whether Plaintiff's decision to modify was made under economic duress, 3) whether Defendant breached its obligation of good faith and fair dealing with respect to its handling of the Agreement, and 4) whether Plaintiff is entitled to damages. The court will address these issues *seriatim.*

### A. *Breach of Contract Claims*
#### 1. *The CES Division*

In Count I of the Complaint Plaintiff alleges that Defendant breached the Agreement by terminating the Agreement without providing sufficient notice to Plaintiff prior to the termination. Plaintiff further argues that if the court finds a valid modification of the Agreement (rather than a termination), the modified contract is unenforceable because it violates the Statute of Frauds. *See* 13 Pa.Cons.Stat.Ann. § 2209(c). To the contrary, Defendant contends that the parties consented to an oral modification of the Agreement; and, that the modification altered the duration clause of the Agreement. Additionally, Defendant argues that Plaintiff waived its defense under the Statute of

Frauds through its conduct by participating in the rebid. *See* 13 Pa.Cons.Stat.Ann. §§ 2201, 2209(d).

▮ Section 2209(c) of the Pennsylvania Commercial Code ("the Code") requires that a modified contract comply with the statute of frauds to be legally enforceable. In *Double-E Sportswear Corp. v. Girard Trust Bank,* 488 F.2d 292, 296 (3d Cir.1973), the United States Court of Appeals for the Third Circuit found that under certain circumstances, the statute of frauds requirement could be waived. Pointing to § 2209(d) of the Code, the appellate court noted:

> while an oral modification of a written agreement may theoretically be precluded, the code does explicitly provide for an oral waiver of the operation of the Statute of Frauds.... And once the Statute of Frauds is waived, there is no barrier to an oral modification of the terms of a written contract under § 2–209(1).[2]

*Girard Trust,* 488 F.2d at 296 (citations omitted, footnote added). Accordingly, the court must determine whether Plaintiff waived the operation of the Statute of Frauds.

In the instant case, Defendant presented Plaintiff with an ultimatum that required Plaintiff to make a business judgment with respect to its relationship with Defendant. At the time the ultimatum was given, there was over one year remaining in Plaintiff's supply contract with Defendant. Plaintiff was given two options: Plaintiff could keep Defendant's business through the end of the contract period, and at the end of the period most likely lose the business to another supplier; or, Plaintiff could give up all rights under the Agreement, rebid the entire contract, and, *if successful* on the rebid, have a more profitable long-term relationship with Defendant. By rebiding the contract Defendant could consolidate its business with one supplier who could provide a "just-in-time"

delivery system.[3] Evidence on the record suggests that this action would streamline Defendant's business and potentially result in dramatic cost savings. Thus, Defendant had a legitimate business purpose for conducting the rebid.

In or about December, 1991, Steve Yount informed Defendant that Sonfast would participate in the rebid. On March 12, 1992, Plaintiff submitted its bid package. At the close of business on that same day, Defendant informed Plaintiff that it had lost the bid. Steve Yount testified that he was shocked and distraught by the outcome of the bid. Despite this, Sonfast made no effort to take advantage of the legal remedies at its disposal and seek immediate enforcement of the original Agreement.

Steve Yount acquiesced to the oral modification of the Agreement when he indicated that Sonfast would participate in the rebid. As modified, the Agreement required Plaintiff to waive all rights guaranteed under the original Agreement and participate in the rebid. If Plaintiff "won" the rebid, the modified Agreement entitled Plaintiff to a more lucrative long-term relationship with Defendant; however, if Plaintiff "lost" the rebid, the modified Agreement provided that the business relationship between Plaintiff and Defendant would end. Furthermore, by submitting two bid packages and actually participating in the rebid, Plaintiff waived its Statute of Frauds defense as to the modified contract. Plaintiff's conduct indicates that it assented to the modification and intended the modification to be binding.

Because the Agreement was orally modified with the consent of both parties, and because Plaintiff by its conduct waived its defense under the Statute of Frauds, a legally enforceable modification was effected pursuant to § 2209(d). Accordingly, the court finds that Defendant did not breach the Agreement.

---

**2.** Section 2–209(1) of the Uniform Commercial Code has been adopted in Pennsylvania as § 2209(a) of the Pennsylvania Commercial Code.

**3.** Just-in-time ("JIT") delivery systems are based upon the development of a partnership-type relationship between a purchaser and a supplier. The theory is that by working almost exclusively with one supplier, the purchaser can eliminate

many of the non-price costs normally associated with continually scouring the market for the best price. By developing a relationship, the supplier and the purchaser can streamline their operations by sharing resources, reducing costs, shortening lead times, and improving on-time performance.

### 2. *The Madisonville Plant*

■ In Count III of the Complaint, Plaintiff alleges that Defendant breached the exclusivity clause of the Agreement with respect to certain fasteners that it purchased for the Madisonville plant. Plaintiff contends that Defendant purchased certain fasteners covered by the Agreement from another supplier. Defendant asserts that it was forced to purchase from another supplier because Plaintiff's fasteners did not work in certain thin sheet metal applications for which Defendants used the fasteners. Although a significant portion of the pre-trial briefing centered on this issue, pursuit of the issue appears to have been abandoned at trial.

Because Plaintiff presented no evidence related to this issue at trial, the court finds that Plaintiff has not carried its burden of proving a breach. Accordingly, the court will rule in favor of Defendant on this issue.

### B. *Economic Duress*

■ Plaintiff next contends that even if the court finds a technically valid modification, the Agreement is voidable because Plaintiff consented to the modification under economic duress. Generally, "[e]conomic duress ... makes a contract voidable, not void." *Seal v. Riverside Federal Savings Bank,* 825 F.Supp. 686, 695 (E.D.Pa.1993). The standards for alleging economic duress under Pennsylvania law are set forth in *National Auto Brokers Corp. v. Aleeda Development Corp.,* 243 Pa.Super. 101, 364 A.2d 470, 474 (1976). In *National Auto Brokers* the court cited two specific elements that must be proven to allege a claim of economic duress. First, the plaintiff must show that "there exists such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which

results in economic loss." *Id.* Additionally, the plaintiff must prove that it does "not have an *immediate* legal remedy." *Id.* In addition to these specific elements, the *National Auto Brokers* court commented on the nature of an economic duress action, stating:

> " '[b]usiness compulsion' it [sic] not established merely by proof that consent was secured by the pressure of financial circumstances. But it is said that a threat of serious financial loss is sufficient to constitute duress and ground for relief *where an ordinary suit at law or equity might not be an adequate remedy.*"

*Id.* (quoting *Tri–State Roofing Co. v. Simon,* 187 Pa.Super. 17, 142 A.2d 333, 335 (1958)) (emphasis added).

■ Plaintiff contends that "[t]he threat of losing the entire York package presented Sonfast with the threat of going out of business.[4] Given the options presented, Sonfast had no other alternative but to succumb to York's demand." (Pl.Brief at 41 (footnote added).) Plaintiff has overstated it's position. The alternative to "succumbing" to York's demand was to elect to enforce the Agreement already in place. Under the original Agreement, Plaintiff had a virtually exclusive right to service the CES Division's fastener requirements through December 31, 1993. At the time of the modification, there was one year left on the contract. Plaintiff could have elected to enforce the Agreement, and in the intervening year either proven its worth to York, or sought new entities with whom to do business. Thus, modification was not the *only* avenue open to Plaintiff.[5]

Assuming *arguendo* that Plaintiff had no choice but to "succumb" to York's demands, Plaintiff has still failed to allege the second element of an economic duress claim, that

---

**4.** Although Sonfast has lost York's business, it has not gone out of business.

**5.** In its reply brief, Plaintiff contends that it had no immediate legal remedy because by suing Defendant "not only would it have lost any future business from its largest customer ... [but it also] would have been perceived very negatively in the industry." The evidence indicates that for a variety of reasons, York was dissatisfied with Sonfast's performance. Whether these reasons were well founded or based upon a personal

vendetta, is not material to this particular discussion. It is, however, material that it appeared that Plaintiff would lose Defendant's business when the Agreement expired regardless of its actions. Thus, Plaintiff's argument carries little weight.

At trial Plaintiff presented no evidence to substantiate its claim that by suing Defendant it would be perceived negatively within the industry. Accordingly, the court will not consider the issue.

there was no immediate legal remedy for Sonfast. Plaintiff could have immediately retracted its waiver and sued to enforce the original Agreement. Such legal action would have placed Plaintiff in the same position as if the ultimatum had never been given. In its briefs Plaintiff relies on the notion that it was entitled to a rather exclusive relationship with York not only for the duration of the Agreement, but also for an indefinite period into the future. While evidence was presented that the contract had been renewed twice in the past, Plaintiff had no legally supportable reason to assume that the Agreement would be renewed.

Defendant's only obligations to Plaintiff were those stated in the Agreement. Thus, under the original Agreement, Defendant was obligated to honor the Agreement through December 31, 1993. Under the modified Agreement, Plaintiff gave up all rights held under the original agreement (including its right to supply through 1993), with hopes of obtaining a more favorable business arrangement with Defendant. Consequently, Plaintiff cannot be found to have made its decision to modify under economic duress. More accurately, the court finds that Plaintiff made a business decision that involved a calculated risk. Plaintiff gambled and lost. Unfortunately, such action does not form the basis of a claim of economic duress. The modified contract will not be voided.

### C. *Good Faith and Fair Dealing*

█ Finally, Plaintiff alleges that "[t]he manner in which York terminated the Fastener Purchasing Agreement and its relationship with Sonfast constituted a violation of York's duty of good faith and fair dealing with Sonfast." (Pl.Brief at 29.) Defendant avers that it proceeded in good faith and that it "had objective commercial reasons to seek the change in duration of the fastener purchasing agreement." (Def.Brief at 13.)

Section 1203 of the Code states that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." 13 Pa.Cons.Stat.Ann. § 1203. By "good faith" the Code means "honesty in fact" and the "observance by the merchant of reasonable commercial standards of fair dealing in the trade." 13 Pa. Cons.Stat.Ann. § 1203 (Purdon's 1984) (Uniform Commercial Code Comment). Comments accompanying this section of the Code have further elaborated on its purpose as follows:

> [t]his section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power. This distinction makes it clear that the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced.

13 Pa.Cons.Stat.Ann. § 1203 (Purdon's Supp. 1994) (Comment). Because the court has already found the modification of the Agreement to be legally enforceable, the issue is whether Defendant breached the Agreement by proceeding with the modification in bad faith.

The crux of Plaintiff's argument is that Defendant, in bad faith, concocted a scheme to terminate the Agreement without complying with the Agreement's explicit procedures for termination. Plaintiff contends that when Defendant proposed the modification of the Agreement, Defendant's true purpose was to obtain a termination. Paragraph 14 of the Agreement states that York may terminate Sonfast if its prices become uncompetitive, but that York must first notify Sonfast of its intention to terminate. Plaintiff claims that Defendant failed to notify it because Defendant knew that Plaintiff would do whatever was necessary to retain Defendant's business.[6] Thus, Plaintiff continues,

---

6. Curiously, it is Plaintiff who draws the court's attention to ¶ 8 of the Agreement which states that "[t]he burden remains with Sonfast to be competitive at all times." The court interprets this clause as placing the burden on Plaintiff to be familiar with current market prices and to keep its prices competitive. Accordingly, it is not evidence of bad faith on the part of Defen-

had Defendant followed the applicable procedures, its true goal of terminating the agreement would have been frustrated. Accordingly, Defendant devised this elaborate scheme to immediately terminate the Agreement.

The court finds Plaintiff's argument untenable. First, the court has determined that the contract was modified, *not* terminated. Consequently, the terms of ¶ 14 are not relevant to the court's analysis.[7] The issue presented then, is whether York proceeded in bad faith with the modification. The evidence indicates that Defendant presented Plaintiff with the *choice* of either proceeding under the original Agreement, or relinquishing its rights under the Agreement in hopes of obtaining a more lucrative, long-term arrangement. That Defendant left the decision to Plaintiff does little to advance Plaintiff's position. Furthermore, had Plaintiff chosen to proceed under the Agreement, it would have lost nothing that it was entitled to under the Agreement.[8] The court finds no support for Plaintiff's argument that Defendant breached its obligation of good faith in the manner in which it obtained a modification of the Agreement. Accordingly, the court finds no breach of the Agreement.

### D. *Damages*

The foregoing discussion has led the court to conclude that there was a valid modification of the Agreement. Thus, Plaintiff is not entitled to damages.

### III. *Conclusions of Law*

1. This court has subject matter jurisdiction over the captioned action because there is diversity of citizenship and the requisite amount in controversy. 28 U.S.C. § 1332.

2. The Fastener Purchasing agreement was orally modified with the consent of both parties.

3. Through its conduct in participating in the rebid, Plaintiff waived its Statute of Frauds defense to the modification. 13 Pa. Cons.Stat.Ann. § 2209(d).

4. By the terms of the modified agreement, the obligations of the parties pursuant to the original Agreement were discharged when Plaintiff lost the rebid.

5. Defendant chose to purchase fasteners from Plaintiff after Plaintiff lost the bid to help "zero" Plaintiff's inventory; Defendant was not obligated to do so.

6. The modified agreement is not voidable because Plaintiff did not modify the Agreement under economic duress.

7. Defendant did not breach its obligation of good faith and fair dealing.

8. Because there was a valid modification of the Fastener Purchasing Agreement which altered the duration of the contract, and because such modification was not induced through economic duress or bad faith, Plaintiff is not entitled to damages.

9. Defendant is entitled to judgment in its favor.

---

dant that Plaintiff was unaware that its prices had become uncompetitive.

7. In its memorandum of law accompanying its order regarding pre-trial dispositive motions, the court noted that neither of the parties had addressed the issue of notification in the context of termination. Accordingly, the court elected not to reach the merits of that issue. Through the evidence presented at trial, and the post-trial briefs submitted by the parties, it has become evident that the Agreement was not terminated. Thus, the notification issue has become moot.

8. Plaintiff attempts to advance the argument that by proceeding under the Agreement, it was sure to lose Defendant's business when the contract expired at the end of 1993. While this may be true, it does nothing to support Plaintiff's case. As was discussed earlier, Defendant's only obligations to Plaintiff were expressed within the Agreement. Defendant was under no obligation to renew the Agreement.