John S. SEAL, Jr.

v.

**RIVERSIDE FEDERAL SAVINGS BANK, et al.**

Civ. No. 91–2021.

United States District Court, E.D. Pennsylvania.

March 16, 1993.

P. Stephen Lerario, Michael P. Giles, Thomas C. Marshall, Lerario & Associates, John Randolph Prince, III, Fellheimer & Eichen, Philadelphia, PA, for plaintiff.

John S. Seal, Jr., pro se.

Samuel J. Rosenthal, Rawle & Henderson, Kathleen Milsark, Dechert, Price & Rhoads, Philadelphia, Mary G. Courtney, Freehold, NJ, for Shant Hovnanian, Vahak Hovnanian.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This case arises out of a failed joint venture partnership between companies controlled by plaintiff John S. Seal, Jr. [hereinafter "Seal"] and companies controlled by defendants Shant and Vahak Hovnanian.[1] Before me are (1) the Hovnanians' joint motion to dismiss the complaint for failure to prosecute or for failure to state a claim; (2) Vahak Hovnanian's motion to dismiss the complaint as to him due to untimely service of process; and (3) Seal's responses to these motions. For the reasons that follow, the complaint will be dismissed in its entirety as to Vahak Hovnanian and in part as to Shant Hovanian.

---

**1.** The three companies controlled by the Hovnanians—Riverside Federal Savings Bank, R.S.L. Investment Corporation, and Riverside Hovnanian Bucks County No. 1, Inc.—are also named as defendants in this case. None of these corporate entities joined in the motions to dismiss at issue today.

## I.

### The Allegations of the Complaint

■ The elaborate complaint consists of 165 paragraphs extending over fifty pages, as well as almost thirty exhibits. In reviewing a motion to dismiss, the well-pleaded allegations of the complaint are to be taken as true and viewed in a light most favorable to the non-moving party, and all reasonable inferences that can be drawn from the facts are to be drawn in favor of the non-moving party. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987); *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985). In accordance with that standard, the following factual account is drawn from the complaint.

The story begins in 1986, when Seal obtained an option to purchase approximately seventy-two acres of vacant land in Warwick Township, Bucks County, Pennsylvania. On that property, Seal hoped to develop and build a number of residential units, later known as Victoria Place. In search of funds to finance the project, Seal contacted Michael Hogan, then Vice–President of New Jersey National Bank, and informed him of the type and amount of development loans he would require. Thereafter, Hogan advised Seal that New Jersey National Bank would not finance the project, and, with Seal's purchasing option approaching its expiration, Seal resolved to sell his option.

Subsequently, Hogan left his employ at New Jersey National Bank and went to work for defendant Riverside Federal Savings Bank ("Riverside"), which is owned by defendants Vahak Hovnanian and Shant Hovnanian (Vahak Hovnanian's son). Interested in the Victoria Place development project, the Hovnanians instructed Hogan to contact Seal and persuade him to participate in a joint venture partnership with Riverside. To that end, Hogan promised Seal that they would meet a number of financial requirements spelled out by Seal.

On January 17, 1986 Riverside executed a commitment letter under which Riverside agreed to be a joint venture partner with Jamison Development Corporation ("Jamison"), a real-estate development company controlled by Mr. Seal, and to provide $1,500,000 in equity capital as well as to provide or obtain some $40,000,000 in loans for the project. Riverside agreed to provide those loans on a non-recourse basis, meaning that neither Seal nor the Hovnanians would need personally to guarantee the loans. Relying upon the terms of this letter, Seal ceased all efforts to sell his option or obtain alternative funding.

In April of 1986, Riverside issued a second commitment letter with similar terms to the first. (Riverside, however, was now to provide $2,250,000, rather than the original $1,500,000, in equity capital). Then, in a meeting on April 16, 1986, Riverside executed a Memorandum of Agreement summarizing the terms of the first two letters. Finally, on or about August 4, 1986, a limited partnership agreement was executed between Victoria Woods, Ltd., the managing partner and assignee of Seal Development Company, and Riverside Hovnanian Bucks County No. 1, Inc. ("RBC"),[2] forming Sovereign Estates, Ltd. ("Sovereign").

Four days before the Victoria Place property was to be purchased, and five days before Seal's option was to expire, Hogan told Seal that (1) Riverside could not, consistent with state and local regulatory requirements, provide the $2,250,000 in equity, and (2) it could not provide or obtain the $40,000,000 loan without Seal's personal guarantees. Seal alleges that defendants were aware of these facts all along, and, by presenting Seal with this information only as his option to purchase was about to expire, they left Seal with no alternative but to accede to various unfavorable conditions in order to receive funds needed to purchase the property. Specifically, on October 7, 1986, the following transactions occurred: (1) in return for a loan of approximately $2,000,000 from Riverside for the purchase of the property, Sovereign executed a note and mortgage with Riv-

---

**2.** RBC was a wholly owned subsidiary of R.S.L. Investment Corporation ("RSL"), which was itself a wholly-owned subsidiary of Riverside. According to Seal, RBC was nothing more than a corporate shell, formally assigned the responsibility to provide funding for the Victoria Woods project.

erside, which Seal personally guaranteed for up to $1,000,000; (2) Sovereign executed a second note and mortgage for a $1,600,000 million loan from Riverside to start the development of the property; and (3) RBC obtained an option to purchase a thirty percent stock interest in Sovereign, which it later exercised. By these transactions, Seal alleges that Riverside breached its initial contractual obligations and managed to place all the partnership risk on Seal and Sovereign.

By the beginning of 1987, Sovereign was running out of construction funds. At a February 1, 1987 meeting, Shant Hovnanian, in addition to refusing to provide additional capital or loans at that time, convinced Seal to provide supplementary collateral and sign an agreement purportedly relieving Riverside, RSL and RBC of any obligation to provide the $40,000,000 in non-recourse construction financing. Seal claims that he agreed to these terms "otherwise Sovereign would be forced into bankruptcy as it was without funds." Complaint at ¶ 45. Subsequently, at a meeting sometime in March, 1987, and then at a settlement of April 27, 1987, Seal was, as he sees it, forced to restructure the $2,000,-000 and $1,600,000 loans, resulting in an increase in his personal liability. Most notably, in return for Riverside's agreement to lend Sovereign $1,700,000 as a replacement for the $1,600,000 loan of October 7, 1986, which would soon come due, Seal agreed to provide a personal guarantee of $1,700,000 as well as additional mortgages to Riverside through two companies under his control.[3]

Despite the agreement allegedly waiving their obligation to do so, defendants continued to represent to Seal that they would obtain the funding as originally agreed to and would not let the project die. Trusting these representations, Seal personally obtained or guaranteed loans from other sources to finance the continuation of the project. Despite these efforts, funds were still insufficient, and Seal decided to sell the Warwick property, as well as the unfinished Victoria Place, to the LinPro Company ("Lin-Pro") for approximately $10,000,000. However, Shant Hovnanian agreed to purchase Seal's interest in Victoria Place and the Warwick property if Sovereign would call off the sale to LinPro. Seal terminated Sovereign's agreement of sale to LinPro, but defendants delayed the completion of their purchase. LinPro offered again to purchase the properties, but Seal, once more at Shant Hovnanian's demand, turned down the offer.

Ultimately, Riverside decided not to purchase Seal's interests in the properties, citing newly-discovered problems with the development project. On October 13, 1988, a group of creditors filed an involuntary Chapter 7 Petition in Bankruptcy against Sovereign. That petition, which was converted into a Chapter 11 proceeding in April 7, 1989, is still pending before the bankruptcy court.

The instant complaint consists of eight counts. Four of those counts—comprising all of the claims asserted against one or both of the Hovnanians—are at issue today: Count II (Breach of Contract for Third-Party Beneficiary); Count III (Breach of Implied Covenant of Good Faith and Fair Dealing); Count VII (Civil Conspiracy); and Count VIII (Aiding and Abetting).[4]

## II.

### The Procedural History

The complaint was filed on March 28, 1991. The Hovnanians, although they had not yet

---

3. These mortgages, executed and delivered to Riverside on April 27, 1987 by Jamison and Warwick Nurseries, Ltd. ("Warwick"), are the subject of two foreclosure actions—since consolidated—brought by the Resolution Trust Corporation (the "RTC") against Jamison and Warwick. *See RTC v. Jamison Dev. Corp.*, Nos. Civ. A. 91-1930, 91-1931 (E.D.Pa. Jan. 8, 1993). On January 8, 1993, summary judgment was entered for $2,671,656.47 in favor of the RTC (the amount of the unpaid principal of the loan, $1,700,000, plus accrued and unpaid interest). On February 8,

1993, Seal filed a notice of appeal from this order.

4. Seal asserts both federal question jurisdiction—premised on Count I, a claim against Riverside under the Federal Home Owners' Loan Act, 12 U.S.C.A. § 1464 (1989)—and diversity jurisdiction (plaintiff is alleged to be a Pennsylvania citizen, and the Hovnanians and the several Riverside entities are apparently domiciled in New Jersey).

filed an answer,[5] served discovery requests on Seal on June 7, 1991. Shortly thereafter, at a July 10, 1991 status conference held in my chambers, Seal's attorney, P. Stephen Lerario, Esq., expressed his desire to withdraw from the case due to a heart attack he had recently suffered, and the case was placed in civil suspense for three months. Seal was unable to find substitute counsel, and Lerario moved, on October 3, 1991, to withdraw from the case. In an October 13, 1991 letter to the court, Seal voiced various objections to Lerario's being allowed to withdraw from the case; most prominently, Seal reported a financial inability to obtain a replacement attorney. Still, in December of 1991, Lerario was granted permission to withdraw.[6] Seal subsequently filed a motion to reconsider that order, which was denied.

At a February 12, 1992 status conference, in response to the Hovnanians' request that the action be dismissed due to Seal's inability to retain replacement counsel, Seal was asked to report to the court within a month on his efforts to retain replacement counsel. Seal did not do so. On October 21, 1992, a scheduling order was filed, directing that all discovery be completed by the end of November, 1992. On November 12, 1992, the Hovnanians filed the instant motion to dismiss for failure to prosecute or failure to state a claim.[7] Approximately one week later, John Randolph Prince, Esq., entered his appearance on behalf of Seal.

### III.

Claims Directed to Plaintiff's Dilatory Conduct

#### 1. *Delinquent Prosecution*

 Defendants argue that the complaint should be dismissed for lack of prosecution pursuant to Fed.R.Civ.P. 41(b) due to Seal's delinquence in complying with their discovery requests of June 7, 1991 and in obtaining replacement counsel. Rule 41(b) authorizes the court to dismiss an action because of the plaintiff's failure to prosecute. However, dismissal of a complaint with prejudice is "an extremely harsh penalty" for delay, *GLO Co. v. Murchison & Co.*, 397 F.2d 928, 929 (3d Cir.1967) (per curiam), *reh'g granted*, 397 F.2d at 929 (vacating the district court's dismissal), *cert. denied*, 393 U.S. 939, 89 S.Ct. 290, 21 L.Ed.2d 276 (1968), and is reserved for extreme situations in which there is a "clear record of contumacious conduct," *Palmer v. City of Decatur*, 814 F.2d 426, 429 (7th Cir.1987), or "a serious showing of willful default," *Gill v. Stolow*, 240 F.2d 669, 670 (2d Cir.1957). *See generally* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2369, at 193–98 (1971). Plaintiff's delay in this case does not present one of those exceptional circumstances in which it is appropriate to dismiss his complaint for failure to prosecute.

Seal, in my view, does not bear a large measure of responsibility for much of the delay in this case. *See Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 868 (3d Cir.1984) (citing this as one of the important factors for the district court to consider when addressing a Rule 41(b) motion for involuntary dismissal). The serious illness of his attorney accounts for a substantial period of delay. While it is true that Seal failed to notify the court of his efforts to obtain replacement counsel by March 12, 1992, as he was ordered, it was well known to this court that Seal—who opposed his counsel's withdrawal—was having trouble obtaining replacement counsel and was busy defending on his own a related case before this court.[8] Now that Seal has been able to obtain counsel who is ready to prosecute this action, I am most reluctant to deny him the opportunity to proceed, especially in the absence of any compelling showing by defendants that they have actually been prejudiced by the

---

5. From May through August of 1991, a number of stipulations were signed extending the time within which the Hovnanians could answer the complaint. The docket shows that the final such extension was granted until October 14, 1991.

6. Lerario formally withdrew his appearance on behalf of Seal on January 30, 1992.

7. On December 9, 1992, Vahak Hovnanian filed the motion to dismiss for untimely service of process.

8. *See supra* note 3.

delay in this case.[9] Accordingly, defendants' request for involuntary dismissal pursuant to Rule 41(b) will be denied.

### 2. Untimely Service of Process

 The complaint was filed in March of 1991; however, defendant Vahak Hovnanian was apparently not served with the complaint until December 8, 1992. (The docket reflects that Shant Hovnanian acknowledged receipt of service on May 3, 1991, well within the time provided by the Federal Rules). Rule 4(j) of the Federal Rules of Civil Procedure provides:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion.

Fed.R.Civ.P. 4(j). The Third Circuit has stressed that Rule 4(j)'s 120–day limit to effect service of process is to be "strictly applied." *Lovelace v. Acme Markets, Inc.*, 820 F.2d 81, 84 (3d Cir.1987). "[I]f service of the summons and the complaint is not made in time and the plaintiff fails to demonstrate good cause for the delay 'the court *must* dismiss the action as to the unserved defendant.'" *Id.* (emphasis in original) (quoting from the legislative history of Rule 4(j)). Although Seal filed a separate "Memorandum of Law in Opposition to Defendant Vahak Hovnanian's Motion to Dismiss," he made no effort to demonstrate good cause for the untimely service or to show why the claim of untimely service may have been waived; accordingly, I see no alternative but to dismiss the complaint as to Vahak Hovnanian without prejudice.[10] This dismissal

---

9. Defendants argue that prejudice exists because various records may have been lost or destroyed and the recollection of witnesses is likely to be dimmed by the passage of time. Such speculative harm to defendants does not justify tossing out plaintiff's entire case. If important information proves to be lost due to plaintiff's delay in responding to the discovery requests, this court may, at the appropriate time, be willing to consider a range of lesser sanctions (for example, taking designated facts to be established for the purposes of this action, *see* Fed.R.Civ.P. 37(b)(2)(A)). Besides, insofar as defendants base their request for dismissal on plaintiff's failure to comply with discovery requests, it is worth noting that defendants never filed a motion to compel discovery with this court. Fed.R.Civ.P. 37(b)(2)(C) authorizes the court to render a judgment by default as a discovery sanction, but only where the party to be defaulted has disobeyed a *court order* to provide or permit discovery.

10. Although plaintiff has not questioned whether the claim of untimely service is properly before this court, it is worth explaining why, in my view, Vahak Hovnanian did not waive that claim by omitting it from the Hovnanians' initial motion to dismiss, filed on November 12, 1992, and only including it in a later submission, filed on December 9, 1992. Rule 12(h)(1) provides that a defendant may waive a defense of service of process by omitting it from a pre-answer motion to dismiss or from the answer itself. Notwithstanding the language of mandatory dismissal in 4(j) and the court's prerogative to order a dismissal on its own initiative, a number of circuits have extended the requirements of 12(h)(1) to 4(j) claims, finding waiver of an untimeliness of service defense where such claim was omitted from either a Rule 12(b) motion or, if no such motion was made, from the answer. *See Pusey v. Dallas Corp.*, 938 F.2d 498, 501 (4th Cir.1991); *Santos v. State Farm Fire and Casualty Co.*, 902 F.2d 1092, 1095–96 (2d Cir.1990); *Pardazi v. Cullman Medical Center*, 896 F.2d 1313, 1316–17 (11th Cir.1990); *Kersh v. Derozier*, 851 F.2d 1509, 1511–12 (5th Cir.1988); *United States v. Gluklick*, 801 F.2d 834, 837 (6th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1376, 94 L.Ed.2d 691 (1987). I assume, *arguendo*, that the Third Circuit would reach the same result. Still, the waiver rules of Rule 12(h) do not preclude a defendant from adding new grounds to a previously-filed motion to dismiss before that motion is ruled upon. *See MacNeil v. Whittemore*, 254 F.2d 820, 821 (2d Cir.1958) ("[Rule 12(h)] does not in any way prevent a judge in his discretion from permitting a party to expand the grounds of motion well in advance of a hearing."); *Guccione v. Flynt*, 617 F.Supp. 917, 918 (S.D.N.Y. 1985) (no waiver where defendant first raised issue of lack of personal jurisdiction in a January 16, 1984 motion to dismiss, after having separately submitted another motion to dismiss on December 12, 1983, because new ground was raised shortly after the first motion and before the court ruled on that motion); *Sunrise Toyota, Ltd v. Toyota Motor Co.*, 55 F.R.D. 519, 528 n. 4 (S.D.N.Y.1972) (no waiver where motions, submitted in separate papers, were both before the court well before the hearing); *see generally* 5A Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 1389 (1990). Here, where defendant raised the new ground for dismissal in due time for the court to consider both motions simultaneously, and plaintiff has had adequate opportunity to respond to the new

without prejudice means simply that the dismissal itself does not bar Seal from bringing a subsequent action on the same claims. *See Santos v. State Farm Fire and Casualty Co.,* 902 F.2d 1092, 1094–95 (2d Cir.1990). I express no view as to whether some or all of the claims against Vahak Hovnanian may be barred by the applicable statute of limitations or whether Seal may be entitled to a tolling of the limitations period from the time of proper service or from sometime sooner.

IV.

The Viability of the Complaint

■ Shant Hovnanian [hereinafter usually referred to as "defendant," and, occasionally, as "Hovnanian" [11]] argues that, with respect to each of the four counts in which he is named, plaintiff has failed to state a claim.[12] I address each of these allegedly deficient counts in turn.[13] No question is raised but that this case is governed by

ground, there is no concern of piecemeal motions practice, and no rights of plaintiff are threatened. *See Sunrise,* 55 F.R.D. at 528 n. 4. Accordingly, I regard the 4(j) claim as part of the original motion to dismiss and, therefore, properly before this court. (Under Rule 12(b), a defendant may enter an appearance and make a motion to dismiss for failure to state a claim without waiving his right to raise objections to jurisdiction and process. *Harrison v. Prather,* 404 F.2d 267, 271–72 (5th Cir.1968); *Gahagan v. Patterson,* 316 F.Supp. 1099, 1101 (D.Minn. 1970)).

**11.** The various arguments going to the merits of the complaint were made by both Vahak and Shant Hovnanian in a joint motion to dismiss. However, in light of the complaint being dismissed as to defendant Vahak Hovnanian due to untimely service of process, *see supra* Part III, 2, questions regarding the merits of the complaint remain relevant only as to Shant Hovnanian.

**12.** Hovnanian also contends that Seal failed to plead various allegations of fraud with the "particularity" required by Fed.R.Civ.P. 9(b). Seal responds that because there is no fraud count in the complaint, the special pleading requirement of Rule 9(b) do not pertain to his complaint. It is true that Rule 9(b) only applies to " 'claims sounding in fraud.' " *Zucker v. Katz,* 708 F.Supp. 525, 530 (S.D.N.Y.1989) (citation omitted); *see also Bosio v. Norbay Securities, Inc.,* 599 F.Supp. 1563, 1570 (E.D.N.Y.1985); *see generally* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297, at 615 (1990) (footnotes omitted) ("Since [Rule 9(b)] is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and not extended to other legal theories or defenses."). However, a number of Seal's claims—while not explicitly fraud claims—depend in certain measure on fraud allegations. Insofar as Rule 9(b) may apply to these claims, I find that these claims describe the circumstances of such allegedly fraudulent activity with sufficient particularity to satisfy the requirements of Rule 9(b), notwithstanding that in some instances the complaint—by referring generally to "defendants"—does not break down each defendant's particular role in the alleged fraud. *See Seville Industrial Mach.*

*Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984) (citation omitted) (after admonishing not to read the "particularity" requirement too narrowly so as to defeat " 'the general simplicity and flexibility contemplated by the rules,' " embracing as an adequate description for purposes of Rule 9(b) a paragraph that referred to a representation made by "defendants" generally), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985); *United States Dep't of HUD ex rel. Givler v. Smith,* 775 F.Supp. 172, 181 (E.D.Pa.1991) (noting that, under *Seville,* the complaint must stand so long as "there is some precision and some measure of substantiation in the allegations," and even if the complaint lacks date, place and time allegations).

**13.** Seal questions the timeliness of the instant motion to dismiss for failure to state a claim. Rule 12(b) of the Federal Rules of Civil Procedure provides that motions under that rule "shall be made before pleading if a further pleading is permitted." Fed.R.Civ.P. 12(b). Therefore, a motion to dismiss for failure to state a claim, like the answer itself, normally must be filed within twenty days of the service of the summons and complaint upon the defendant. Defendant Shant Hovnanian was served on May 3, 1991, and the instant motion to dismiss was not filed until November 12, 1992. However, until October, 1991, defendants received stipulated extensions for answering or otherwise proceeding. *See Bechtel v. Liberty Nat'l Bank,* 534 F.2d 1335, 1341 (9th Cir.1976) (extensions for time to answer a complaint logically apply also to a motion to dismiss that complaint). Further, at a status conference convened on January 10, 1992, defendants' counsel requested additional time to answer the complaint while the case was held in suspense pending appearance of substitute counsel for plaintiff, and this court offered assurances that defendants would not forfeit their right to challenge the merits of the complaint while plaintiff was allowed to seek alternate counsel. (Indeed, in February, 1992, defendants' request for oral argument on a motion to dismiss was granted, and then vacated, so that Seal would have additional time to obtain substitute counsel). Given this background, it would be unfair to prevent Shant Hovnanian from receiving a hearing on his motion to dismiss.

Pennsylvania law.[14]

### 1. Breach of Contract for a Third–Party Beneficiary (Count II)

Plaintiff alleges that (1) the two commitment letters, the April 16, 1986 Memorandum of Agreement, and the August 4, 1986 Limited Partnership Agreement together constituted a contract between Seal's corporations and Riverside, and (2) Riverside, RSL, RBC, and the Hovnanians breached this contract by forcing modifications decidedly more unfavorable to Seal. According to Seal, the defendants reneged on the agreements that Seal would not have to issue personal guaranties on any of the funding transactions and would not have to borrow additional funds. As relief, Seal seeks, among other things, to be relieved of his personal guarantees totalling $2,700,000 as well as his obligations to repay an additional loan from Riverside and loans from several other creditors. Hovnanian offers three reasons why Count II must be dismissed for failure to state a claim: (1) Seal is neither a party to any of these agreement nor a third-party beneficiary of those agreements, (2) Seal, in any event, modified his rights under those contracts by agreeing to restructure those deals on October 7, 1986 and in early 1987; and (3) even if Riverside, RSL and RBC committed a breach of contract, the corporate veil cannot be pierced to reach Hovnanian (a controlling shareholder and officer of Riverside).

▮ Assuming, *arguendo*, that Seal is a third-party beneficiary to the various agreements and that Hovnanian can be held personally liable,[15] Seal would still not be entitled to recover on the express terms of the contract culminating in the August, 1986 Limited Partnership Agreement unless he can show that the agreements entered into on October 7, 1986 and in early 1987—creating the terms of which Seal complains—did not legally modify or supersede the earlier agreements to which he hopes to return. *See Miller v. Travelers Ins. Co.*, 143 Pa.Super. 270, 17 A.2d 907, 908 (1941) ("A third party beneficiary in an ordinary contract is subject to the limitation of its terms as he has no greater rights under it than are provided in the contract itself."); Restatement of Contracts § 140 (1932). Seal's position apparently is that defendants—through a series of misrepresentations about their ability and willingness to provide the original funding promised—maneuvered the financially-strapped Seal and Sovereign into an economic crisis and caused Seal to execute the later agreements against his will.

---

14. The counts of the complaint at issue on this motion to dismiss arise under the common law of the Commonwealth of Pennsylvania, *see* Complaint at ¶ 2, and Hovnanian, in his submissions, apparently agrees that Pennsylvania law applies. Because (1) Seal, the debtor, is a citizen of Pennsylvania; (2) the property at issue, Victoria Place, is located in Pennsylvania; (3) the Sovereign limited partnership was established pursuant to the Pennsylvania Uniform Limited Partnership Act, *see* Complaint Exh. D, and the partners' rights were to be construed in accordance with the laws of the Commonwealth, *see* Complaint Exh. D at ¶ 12.03; (4) the October 7, 1986 notes and mortgages for $2,000,000 and $1,600,000 million were executed on behalf of Sovereign in Philadelphia, with those notes to "be governed by and construed according to the substantive laws of the Commonwealth of Pennsylvania," Complaint Exhs. E at 4 & F at 4; (5) the April 27, 1987 amendments to the $2,000,000 note and mortgage and the $1,700,000 replacement loan were executed in the County of Philadelphia, *see* Complaint Exhs. N,O; (6) Seal's personal guarantee of $1,700,000, entered into on April 27, 1987, was "to be construed in accordance with Pennsylvania law," Complaint Exh. P at 3; and

(7) the additional mortgages were all on Pennsylvania properties and executed and acknowledged in Pennsylvania, *see* Exh. K, Pennsylvania has an overwhelming interest in this case, and I see no reason to disturb the parties' expectation that Pennsylvania law applies. It is true that, on the defendants' side of the ledger, there are New Jersey citizens and corporations, and, presumably, some of the contract negotiations took place in New Jersey. However, this case, in the main, raises the question whether defendants wrongfully caused Seal to enter into the subsequent agreements, all of which were executed in Pennsylvania and most of which were to be governed by the laws of the Commonwealth. Therefore, I conclude that a Pennsylvania Court of Common Pleas would find that Pennsylvania is "the place having the most interest in the problem and which is the most intimately concerned with the outcome," *Complaint of Bankers Trust Co.*, 752 F.2d 874, 882 (3d Cir.1984), and hence would apply Pennsylvania law.

15. *See infra* note 23 for discussion of these issues with relation to Count III (Breach of Duty of Good Faith and Fair Dealing).

Once the parties have entered into an integrated contract, a court must give effect to the contract "[a]bsent illegality, unconscionableness, fraud, duress, or mistake...." *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009 (3d Cir.1980). A party asserting economic duress must show a wrongful act or threat by the other party that left the victim no reasonable alternative. Restatement (Second) of Contracts § 175(1) (1981); *see Plechner v. Widener College, Inc*, 418 F.Supp. 1282, 1294 (E.D.Pa.1976) (noting that a previous Restatement formulation—similar to the present rule—is the law of most jurisdictions), *aff'd* 569 F.2d 1250 (3d Cir.1977). The complaint alleges that because defendants threatened not to advance the funds originally promised if Seal did not provide additional collateral, and because Seal badly needed the funds first to exercise his purchasing option and, later, to save the project and his business, he acceded to those terms against his will. "It is well settled that merely because one enters into an agreement which he would not enter if he did not need the money there is not such duress as will void the contract." *Lawlor v. Nat'l Screen Service Corp.*, 211 F.2d 934, 937 (3d Cir.1954), *rev'd on other grounds*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *see also Harrison v. Fred S. James, P.A., Inc.*, 558 F.Supp. 438, 443 (E.D.Pa.1983). Still, business compulsion is a species of duress, and may be established by proof of such a " 'threat [of serious financial loss] that, in conjunction with other circumstances and business necessity, the party so coerced fears a loss of business unless he does so enter in the contract as demanded.' " *National Auto Brokers Corp v. Aleeda Dev. Corp.*, 243 Pa.Super. 101, 364 A.2d 470, 474 (1976) (citation omitted). Highly relevant is whether the party exerting pressure has contributed to the other's financial difficulty. *See id.* 364 A.2d at 475; *accord Continental Bank of Pa. v. Barclay Riding Academy*, 93 N.J. 153, 459 A.2d 1163, 1176, *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 684 (1983).

The complaint alleges that defendants contributed to Seal's financial distress by misrepresenting their interest in, and ability to fund, the project. Fraud in the inducement of a contract may be shown to avoid an alleged contract. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 178 (3d Cir.1992) (applying Pennsylvania law). The party seeking to avoid the contract must show that the other party knowingly made an affirmative misrepresentation .or concealed a fact. *Id.* Further, the party seeking avoidance must show that he reasonably relied on the misrepresentation in entering the contract. *Id.*

Regardless of whether plaintiff has stated a colorable claim that the subsequent agreements were induced by economic coercion or by fraud, the allegations of the complaint indicate that plaintiff ratified those agreements and, hence, waived his power to avoid the contract modifications on these grounds.

A. Ratification of a Contract Induced Under Duress

Economic duress ordinarily makes a contract voidable, not void. *See Agathos v. Starlite Motel*, 977 F.2d 1500, 1506 (3d Cir. 1992) (citing Restatement (Second) of Contracts § 175 cmt d. (1981)); *National Auto Brokers*, 364 A.2d at 473. This distinction is important since a victim of duress may be held to have ratified the contract if it is merely voidable. Restatement (Second) of Contract § 174 cmt. b (1981).

The Pennsylvania Superior Court's decision in *National Auto Brokers* is highly instructive on the question of when an injured party ratifies an agreement that may have been economically coerced. That case involved two writings, the first of which, drafted on July 4, 1972, described plaintiff's option to purchase 520 acres of land from defendant, collateralized by 50,000 shares of plaintiff's stock. Subsequent to the drafting of the purchasing option, defendant learned that plaintiff's stock was worth less than it expected and informed plaintiff that the original option agreement was unacceptable and additional security was required. On August 3, 1972, the parties entered into a second agreement substantially modifying the terms of the July 4 option agreement in defendant's favor and providing for a formalized agreement of sale (with monthly payments from

plaintiff to defendant). Plaintiff then proceeded to begin developing the property. However, plaintiff defaulted on its October, 1972 payment to defendant. Plaintiff attempted to renegotiate the August 3 agreement, but defendant rejected the proposal. On October 20, 1972, plaintiff sued for specific performance of the original July 4 agreement, arguing that it was forced to enter the second agreement of August 3 by economic duress and business compulsion. The trial court found for the plaintiff, holding that business compulsion voided the August 3 agreement.

The Superior Court reversed. The Superior Court found, first, that the facts did not support a finding that the August 3 agreement was induced by economic duress. According to the Superior Court, although plaintiff had been in financial distress, it (1) had immediate legal remedies at the time, including bringing its suit for specific performance as soon as defendant demanded additional collateral, and (2) had created its own financial troubles. Second—and this is what is directly relevant to the case at bar—the Superior Court found that even if the contract had been economically coerced, plaintiff's actions had ratified the contract:

> A party who possesses a power of avoidance for business coercion loses it by electing to affirm the transaction. Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract.

364 A.2d at 476 (citations omitted). The Superior Court noted that following the August 3 agreement, plaintiff proceeded pursuant to that agreement, making various payments thereunder. Further, rather than seeking to rescind the contract, plaintiff sought instead to modify it; only after that attempt failed did plaintiff bring the suit. Accordingly, the Superior Court held that plaintiff was bound by the terms of the second agreement.

 Following the legal guidelines articulated in *National Auto Brokers*, and accepting the allegations of the complaint as true, it is clear that no relief on Count II could be granted under any set of set of facts that plaintiff could prove consistent with those allegations; Seal, as a matter of law, ratified the contract modifications. According to the complaint, after the October 7, 1986 settlement, Seal and Sovereign purchased the Victoria place property with the loan proceeds that flowed from the transactions that Seal now calls into question. After signing an agreement relieving defendants of their obligation to provide the original financing, Seal and Sovereign, on April 27, 1987, accepted a $1,700,000 loan that was used to develop the property. *See* Complaint Exh.P (including copy of the April 1987 check made out for $1,700,000 to Sovereign by Riverside). By the summer of 1987, and faced with serious insufficiency of funds, Seal—rather than seeking to rescind the modified agreements with defendants or to obtain specific performance of the original terms of the Memorandum of Agreement—instead looked to sell the property. Thereafter, Seal attempted to have defendants purchase the property and clear him of all debts and personal guarantees. It was not until approximately two-and-one half years after this deal fell through, and after forfeiture and bankruptcy proceedings had commenced, that Plaintiff filed the instant action seeking to return to the terms of the original contract. Having accepted the benefits flowing from the modified agreements and having failed to erect a legal challenge to those modified terms until a significant period of time had passed— much longer even than in *National Auto Brokers*—plaintiff cannot now be heard to claim that those agreements were induced by economic coercion.

### B. Ratification of a Contract Fraudulently Induced

 Insofar as the allegations permit the inference of a colorable claim that plaintiff entered into and acquiesced in the subsequent agreements because of a pattern of fraudulent misrepresentations by defendants—a theory which plaintiff does not pursue in his submissions—it is clear from the face of the complaint that plaintiff similarly cannot avoid the contract modifications on

this ground. Fraudulent inducement, like duress, ordinarily makes a contract voidable, not void. *In re Allegheny,* 954 F.2d at 178; *Culbreth v. Simone,* 511 F.Supp. 906, 915 (E.D.Pa.1981) (discussing Pennsylvania law); Restatement (Second) of Contracts § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material representation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."). A party seeking to rescind a contract for fraud "must act promptly to rescind once the fraud is discovered." *Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Invs.,* 951 F.2d 1399, 1408 (3d Cir.1991) (applying Pennsylvania law)[16]; *see generally* Restatement (Second) of Contracts § 380 (1981). Seal alleges that he was induced to modify the agreements because defendants falsely assured him that they would be able to get the desired financing originally promised and would follow through with their original commitments despite the terms of the subsequent loan documents. *See* Complaint at ¶ 41. These misrepresentations and false promises allegedly continued through December of 1987. *See id.* By the summer of 1987, Sovereign had insufficient funds to continue with construction of Victoria Place and, retreating from the idea that Riverside would "comply with its commitments," Complaint at ¶ 57, Seal began to look for a purchaser for the property. By February, 1988, when Sovereign stopped all work on Victoria Place due to "Defendants' failure to provide or obtain sufficient loans or equity capital to fund the project," Complaint at ¶ 66, Seal might have recognized the hollowness of defendants' assurances that they would able to put together the lending package and honor their original commitments. Still, accepting the allegations of the complaint as true, only by August 29, 1988—when foreclosure proceedings were commenced against Sovereign at Shant Hovnanian's insistence—did Seal,

"[f]or the first time" "realize[ ] that [he, Sovereign and its related entities] had been the victims of all of the Defendants' manipulations, and schemes for over two and one half years...." Complaint at ¶ 75. Upon discovery of defendants' subterfuges, plaintiff, rather than seeking to rescind the modified agreements or otherwise enforce the terms of the original agreements, attempted instead to sell the property or find alternative financing. Seal filed the instant action seeking to avoid the later loan agreements on March 28, 1991—approximately two-and-one-half years after he acknowledges discovering defendants' machinations. Given this considerable delay and pattern of behavior inconsistent with disaffirmance, plaintiff has simply failed to state a claim for fraudulent inducement on which he is entitled to relief under any conceivable set of facts consistent with the allegations of the complaint. *See Sixsmith v. Martsolf,* 413 Pa. 150, 196 A.2d 662, 663 (1964) (action designed to rescind a contract secured by fraud properly dismissed for failure to state a claim because that action—instituted more than twenty-five months after completion of the transaction described in the contract—was "legally too late for this purpose").

Accordingly, Count II will be dismissed for failure to state a claim.

### 2. *Breach of Implied Covenant of Good Faith and Fair Dealing (Count III)*

Seal alleges that defendants breached an implied obligation of good faith and fair dealing by, among other things, failing to disclose certain funding difficulties, requiring Seal and the entities controlled by him to assume an unfair risk burden, and misrepresenting their interest in entering a joint venture partnership with Sovereign. Shant Hovnanian argues that, under Pennsylvania law, no implied covenant of good faith and fair deal-

---

**16.** The *Mellon Bank* court points out that, as an alternative to prompt rescission, the party may affirm the contract and maintain an action in deceit for damages. 951 F.2d at 1408. " 'An action in trespass for deceit to recover damages for material misrepresentations inducing the making of a contract is founded on fraud or moral wrong, and is not based on the contract.' "

*Associated Hardware Supply Co. v. Big Wheel Distrib. Co.,* 355 F.2d 114, 120 (3d Cir.1966) (citation omitted). However, as plaintiff argued in response to defendants' attempt to make him state his claims with the particularity required of Fed.R.Civ.P. 9(b), *see supra* note 12, the complaint does not include a claim for fraudulent misrepresentation, as such.

ing exists in an agreement between a borrower and a lending institution.

In an effort to demonstrate the general applicability of the covenant of good faith and fair dealing, plaintiff refers to section 205 of the Restatement (Second) of Contracts: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (1981). The Superior Court of Pennsylvania recently noted that

> the general duty of good faith and fair dealing in the performance of a contract as found in ... § 205, has been adopted in this Commonwealth in *Creeger Brick and Building Supply Inc. v. Mid–State Bank & Trust Co.*, 385 Pa.Super. 30, 35, 560 A.2d 151, 153 (1989), and *Baker v. Lafayette College*, 350 Pa.Super. 68, 84, 504 A.2d 247, 255 (1986), *aff'd* 516 Pa. 291, 532 A.2d 399 (1987).

*Somers v. Somers*, 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992);[17] *see also Fluid Power, Inc. v. Vickers, Inc.*, No. Civ. A. 92–0302, 1993 WL 23854 * 5 (E.D.Pa. Jan. 28, 1993) (recognizing a duty of good faith and fair dealing in a distributorship arrangement based on *Somers*.) The pronouncement of the *Somers* court requires further attention because one of the opinions cited as adopting the general duty of good faith—*Creeger*—appears, at first blush, to deny it full force. In fact, *Creeger* is prominently cited by defendant Hovnanian for the proposition that no duty of good faith pertains in the instant action.

In *Creeger*, plaintiff, a brick and building supply company, had secured a Small Business Administration loan from the defendant bank in order to repair a brick manufacturing plant that it had purchased. To obtain the loan, plaintiff had mortgaged the plant and several properties owned by its presi-

dent. When plaintiff encountered a cash shortage, it applied for an additional line of credit from the bank. The bank refused, and later also refused to release the lien on one of the mortgaged properties to allow its sale. Further, the bank would not assign its interest in the loan to a new lender. Subsequently, plaintiff went out of business.

Plaintiff filed suit against the defendant bank, alleging that it had failed to deal with it in good faith by—to recite a few of the claims—refusing to extend a line of credit or promptly release the mortgage, failing to assist plaintiff in obtaining supplemental funding, and overcollateralizing the loan. The court—while noting that § 205 suggested a general duty of good faith and fair dealing[18]—observed that the Pennsylvania Supreme Court and other courts have "refused to apply a duty of good faith to alter or defeat the rights of a creditor which have been granted by law or contract." 560 A.2d at 154. The court concluded:

> It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon a contracting party does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons.

560 A.2d at 154; *see also Bohm v. Commerce Union Bank of Tennessee*, 794 F.Supp. 158, 163 (W.D.Pa.1992) (following *Creeger* ).

Similarly, the court in *Baker*—the other opinion cited by the *Somers* court for the proposition that § 205 has been adopted in Pennsylvania—emphasized that its holding was a "narrow one," and expressly refused to decide whether an obligation of good faith and fair dealing should be implied in every employer-employee relationship. *See* 504 A.2d at 255.

---

17. Recently, the Superior Court reaffirmed that "[f]undamentally, every contract imposes upon the parties a duty of good faith and fair dealing in the performance and enforcement of the contract." *Liazis v. Kosta*, 421 Pa.Super. 502, 618 A.2d 450, 454 (1992).

18. The *Creeger* court observed that the duty of good faith has been recognized in the Commonwealth "in limited situations." 560 A.2d at 153.

In short, *Creeger* is authority for the self-evident proposition that the implied duty of good faith cannot defeat a party's express contractual rights by imposing upon that party specific obligations that it is entitled, by express contract, to resist.[19] Just as Seal cannot avoid the express terms of the modified loan agreements by alleging that he was induced by fraud or duress to agree to them, *see supra* Part IV, 1, so too he cannot, in the name of an implied covenant, defeat his creditor's right to enforce terms to which Seal agreed but now finds unfavorable. However, Count III—broadly construed, as it must be [20]—describes more than a borrower's frustration with a lender's negotiation of terms favorable to the lender and a lender's stubborn adherence to its agreement with the borrower. It alleges a scheme by a joint venture partner—pledged at the outset to procure all necessary funding for the project[21]—who, in lieu of furthering the interests of the joint partnership, undermined the possibility of development of the project by withholding a host of information that might have allowed its partner to obtain proper funding. *Cf. AAMCO Transmissions, Inc. v. Harris*, 759 F.Supp. 1141, 1148–49 (E.D.Pa. 1991) (finding that defendant—who failed to inform the purchaser of its franchise that the franchise was being investigated by a state attorney general—may have had an implied duty to disclose such information before the purchase). The chief purpose of the good-faith obligation is "to enable enforcement of the contract terms in a manner consistent with the parties' reasonable expectations." *Coxfam, Inc. v. AAMCO Transmissions, Inc.*, No. Civ. A. 88–6105, 1990 WL 131064 at *5 (E.D.Pa.1990); *see Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214, 214 (1917) (Cardozo, J.) (citation omitted) ("A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed."); *see generally* S.

Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 371 (1980). Similarly, the related "doctrine of necessary implication" provides that

> "[i]n the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract."

*Somers*, 613 A.2d at 1214 (quoting *Frickert v. Deiter Brothers Fuel Co.*, 464 Pa. 596, 347 A.2d 701, 705 (1975) (Pomeroy, J., concurring)); *see also* E.A. Farnsworth, *Contracts* § 7.17 at 527 (1982) (footnotes omitted) ("A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals."). Given Riverside's agreement to enter a joint venture partnership, a trier of fact could find that Seal reasonably expected the defendants to provide all information to Seal that might have enabled him to make the project a success. Instead, according to the complaint, the defendants exaggerated their interest in acting as joint venture partners and failed to disclose to Seal difficulties they were having in obtaining funding. The duty of good faith has been defined as "honesty in fact in the conduct or transaction concerned," Restatement (Second) of Contracts § 205 cmt. a (1981), and conduct such as subterfuge and evasion clearly violates the duty, *see* Restatement (Second) § 205 cmt. d (1981) ("Subterfuges and evasions violate the obligation of

19. *See AAMCO Transmissions, Inc. v. Harris*, 759 F.Supp. 1141, 1147 (E.D.Pa.1991) (obligations encompassed by the express terms of an agreement cannot be the subject of an implied covenant of good faith); *Coxfam, Inc. v. AAMCO Transmissions, Inc.*, No. Civ. A. 88–6105, 1990 WL 131064 at *5 (E.D.Pa.1990) (same).

20. *See Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80 (1957).

21. *See, e.g.,* Complaint Exh. A at ¶ 4 (January 17, 1986 commitment letter) ("[Riverside] will provide or obtain all necessary financing including construction loans for the townhouse and apartments, and end loan for the townhouses and apartments."); Complaint Exh. C at ¶ 4 (April 16, 1986 Memorandum of Agreement) (similar provision).

good faith in performance even though the actor believes his conduct to be justified."). In light of the Restatement's broadly-phrased requirement of fair dealing—which has been embraced with increased vigor by the Pennsylvania Superior Court in recent years—and considering the allegations of dishonesty and manipulation against a joint venture partner—allegations that extend far beyond a lender's negotiation of terms favorable to itself—it seems unlikely that the Pennsylvania courts would decline to find that a duty of good faith pertains in the situation at bar.[22]

Although Seal will not be able, through this implied covenant, to rescind obligations that he expressly entered into with defendants, *see* text at n. 19, he may, if he is able to prove his allegations, be able to recover damages for defendants' failure to disclose certain funding difficulties or falsely holding themselves out as interested joint venture partners, where those actions caused Seal to forego other economic opportunities. On these terms, I will allow Count III of the complaint to proceed against Shant Hovnanian.[23]

### 3. Civil Conspiracy (Count VII) and Aiding and Abetting (Count VIII)

In Count VII of the complaint, plaintiff alleges that Riverside and the Hovnanians—the two officers of Riverside—unlawfully conspired among themselves to commit a number of unlawful acts (or lawful acts by unlawful means). In Count VIII—an aiding

---

**22.** When the Pennsylvania Supreme Court has not addressed an issue, a federal court sitting in diversity must predict how that court will rule. *Rolick v. Collins Pine Co.*, 925 F.2d 661, 664 (3d Cir.1991). "[P]roper regard must also be given to the decisions of [Pennsylvania's] intermediate appellate courts." *Id.*

**23.** Under Pennsylvania law, it is established that where a good faith duty exists, "it arises under the law of contracts, not under the law of torts." *Creeger*, 560 A.2d at 153. Therefore, although Hovnanian argues only that Count II (breach of contract for a third-party beneficiary) must be dismissed because plaintiff is not a third-party beneficiary, I suppose that this argument applies also to Count III (breach of implied covenant of good faith) insofar as, therein, plaintiff must be seeking to recover under the strength of the contract. A party may recover on a contract as a third-party beneficiary if "recognition of a beneficiary's right to performance is 'appropriate to effectuate the intention of the parties....'" *Fizz v. Kurtz, Dowd & Nuss, Inc.*, 360 Pa.Super. 151, 519 A.2d 1037, 1039 (1987) (quoting *Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744, 751 (1983)). With respect to Count II, Hovnanian argued that since Seal was not mentioned as a party to any of the loan agreements or intended by defendants to be benefitted by them, the facts alleged are insufficient to confer on Seal the status of a third-party beneficiary. However, the complaint alleges that

> it was the intent of the parties to the agreements that Seal would benefit substantially from the agreements, as evidenced by the specific language of the agreements, which stated that he, as a principal of a joint venture partner, would not be required to guarantee personally any of the loans to the partnership, nor would he be required to borrow any funds personally on behalf of the project and would be receiving profits and salary.

Complaint at ¶ 100. The initial letter agreements guaranteed that Riverside would not require any of its loans to be personally guaranteed by the Joint Venture Partners, *see* Complaint Exhs. A at ¶ 10 & Exh. B at ¶ 11, and one could infer from the agreements that Seal—a principal of a joint venture partner—was intended to benefit from this provision, even though he was not mentioned by name. *See University Patents, Inc. v. Kligman*, 762 F.Supp. 1212, 1220 (E.D.Pa.1991). (Indeed, Seal—who was mentioned specifically and repeatedly by name in the limited partnership agreement, *see* Complaint Exh. D—later himself entered into several commitments to personally guarantee the various loans). Therefore, allowing that Hovnanian may have intended to direct the third-party beneficiary argument also to Count III, I am not persuaded that this count should be dismissed for that reason.

Similarly, it may be that plaintiff will have to pierce the corporate veils of Riverside and RSL and RBC in order to hold Shant Hovnanian liable for breach of a duty of good faith. Even so, I am convinced that the complaint—which alleges that Riverside, RSL and RBC were grossly undercapitalized, Complaint at ¶¶ 105–06, 115, that these entities did not observe corporate formalities, Complaint at ¶¶ 110, 115, and that the Hovnanians' personal assets were intermingled with these corporate assets, Complaint at ¶ 115—alleges facts which, if believed, suggest that it might be appropriate to pierce the corporate veils to reach Shant Hovnanian. *See Village at Camelback v. Carr*, 371 Pa.Super. 452, 538 A.2d 528, 533 (1988) (in deciding whether to pierce the corporate veil, courts are concerned with determining "if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder"), *aff'd* 524 Pa. 330, 572 A.2d 1 (1900); *Sweeney v. Dep't of Transp.*, 120 Pa.Cmwlth. 591, 549 A.2d 1001, 1003 (1988).

and abetting count against the various Riverside entities and Shant Hovnanian—the complaint alleges that Hogan and Hovnanian "knew, or should have known," of various tortious representations with respect to funding, and that they assisted in the performance of such conduct "by making the misrepresentations and/or omitting and/or failing to disclose" those facts. Complaint at ¶163. Hovnanian has offered a number of reasons why these claims should be dismissed; however, Seal, in his several opposing submissions, does not address these arguments or otherwise defend the viability of his civil conspiracy and aiding and abetting claims. Accordingly, these claims will be dismissed.

### V.

### Conclusion

The complaint will be dismissed without prejudice as to Vahak Hovnanian due to untimely service of process. Although I will dismiss three claims against Shant Hovnanian—breach of contract for a third-party beneficiary (Count II), civil conspiracy (Count VII) and aiding and abetting (Count VIII)—Seal will be allowed to proceed with his claim that Shant Hovnanian breached an implied covenant of good faith and fair dealing.

An appropriate order follows.

### ORDER

For the reasons given in the accompanying memorandum, it is hereby ORDERED and DIRECTED that:

(1) Vahak Hovnanian's motion to dismiss for untimely service of process (doc. # 25) is GRANTED, and the complaint is dismissed as against Vahak Hovnanian; and

(2) Shant Hovnanian's motion to dismiss for failure to prosecute or failure to state a claim (doc. # 21) is GRANTED in part and DENIED in part as follows:

a) Count II (Breach of Contract for Third-Party Beneficiary) is DISMISSED as against Shant Hovnanian;

b) Count VII (Civil Conspiracy) is DISMISSED as against Shant Hovnanian;

c) Count VIII (Aiding and Abetting) is DISMISSED as against Shant Hovnanian; and

d) Shant Hovnanian's motion to dismiss for failure to prosecute or failure to state a claim is DENIED in all other respects.